741 A.2d 666

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**John A. SMALL, Appellant.**

Supreme Court of Pennsylvania.

Argued Nov. 17, 1998.

Decided Nov. 1, 1999.

424

430

Robert D. O'Brien, York, for J. Small.

John W. Thompson, Jr., York, Robert A. Graci, Harrisburg, Mary Lou V. Erb, York, for the Com.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## OPINION

CASTILLE, Justice.

This is a direct appeal from a sentence of death imposed by the Court of Common Pleas of York County.[1] Following a jury trial, which commenced on May 7, 1996, appellant was convicted of first degree murder[2] and attempted rape[3] in connection with the 1981 death of Cheryl Smith. The jury determined that the two aggravating circumstances it found outweighed the two mitigating circumstances and returned a

1. 42 Pa.C.S. § 9711(h)(1).
2. 18 Pa.C.S. § 2502(a).
3. 18 Pa.C.S. §§ 3121, 901.

sentence of death.[4] On June 19, 1996, the trial court imposed the jury's sentence of death for the first degree murder conviction and additionally sentenced appellant to serve an aggregate term of five to ten years imprisonment for the attempted rape conviction to run consecutive to the death sentence. For the reasons below, we affirm the conviction and judgment of sentence.

## I. SUFFICIENCY OF THE EVIDENCE

Appellant first claims that the evidence was insufficient to support the jury's verdict that he was guilty of first degree murder and attempted rape. When reviewing a sufficiency of the evidence claim, an appellate court must view all the evidence and all reasonable inferences arising therefrom in the light most favorable to the Commonwealth as the verdict winner in order to determine whether the evidence was sufficient to enable the finder of fact to find that all of the elements of the offenses were established beyond a reasonable doubt. *Commonwealth v. Hall*, 549 Pa. 269, 279, 701 A.2d 190, 195 (1997), *cert. denied*, 523 U.S. 1082, 118 S.Ct. 1534, 140 L.Ed.2d 684 (1998). After a review of the record, we find the evidence is sufficient to support the first degree murder and attempted rape convictions.

The evidence at trial established that on the evening of August 5, 1981, a group of people, including the victim, attended a party in the Borough of Hanover. Even though many of the attendees at the party were underage, large quantities of alcohol and marijuana were consumed. At some point during the evening, a fight erupted and the police were called to the scene. Prior to the arrival of the responding

---

**4.** The aggravating circumstances were that: appellant committed the killing in the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6), and appellant had a significant history of felony convictions involving the use of threat or violence. 42 Pa.C.S. § 9711(d)(9). At trial, appellant instructed his attorney not to present mitigating testimony. Nevertheless, the jury, *sua sponte*, found that the guilt phase evidence and the Commonwealth's penalty phase evidence established two mitigating circumstances: no identified convictions since 1982, 42 Pa.C.S. § 9711(e)(8), and appellant voluntarily identified burglary locations in the presence of police officers. 42 Pa.C.S. § 9711(e)(8).

police officers, a group of the partygoers left in two separate vehicles and drove to a local tavern. After consuming more alcohol at the tavern, the group drove to a wooded area outside of Hanover, known as "the Pines." Several members of the group departed. At one point, the victim left the remaining members of the group and went into the woods to relieve herself. She was followed by appellant and co-defendant James Frey. Sometime thereafter, witnesses testified that they heard the victim scream. An eyewitness, Larry Tucker, later testified at trial that he had followed appellant into the woods and then watched appellant and the co-defendant grab the victim, throw her to the ground and say to her "you give it to everybody else".[5] Appellant was seen shortly thereafter coming out of the woods with blood on his hands. Co-defendant Frey followed several minutes later and the remaining members of the group then left the Pines leaving the victim in the woods. The victim was never seen alive again and her body was found seven weeks later, in a spread eagle position, naked from the waist down with her shirt rolled around her neck, exposing her upper torso. Forensic evidence indicated that the cause of death was a head trauma.

No arrest was made for a number of years. Finally, police investigators learned that appellant had been making incriminating statements implicating himself in the murder. Linda Rhinehart testified that she overhead appellant at an arcade in Hanover state to some friends that: "I followed her into the woods' cause I was going to get some of that . . . She won't be a tease anymore. It's amazing what a tire iron can do to hush someone making that much noise." Cerenna Hughes testified that appellant told her that after the night at the Pines, Cheryl "run away" and "she gave in, she gave up." Harry H. Carper III testified that sometime during 1981, he visited appellant at his home and appellant stated "he might have

5. Larry Tucker was the Commonwealth's main witness. Tucker was originally charged with first degree murder as a co-conspirator. In return for his testimony, Tucker reached an agreement with the Commonwealth whereby he would be charged with a crime no higher than third degree murder. Thereafter, the trial court granted his motion to sever.

killed" Cheryl Smith and that "he hit her over the top of her head." Lastly, Janice Small, appellant's wife at the time of the murder, testified that one night in 1981 when Carper was visiting at their residence, she overheard appellant say to Carper "I killed a girl.... [We] hit her over the head, dumped her ass in the woods and left her there." She also testified that on one occasion when she was reading a newspaper article about the murder, appellant walked by and said, "that's the girl we killed."

In order to sustain a conviction for first degree murder, the Commonwealth must prove (1) that the defendant acted with a specific intent to kill; (2) that a human being was unlawfully killed; (3) that the person accused did the killing; and (4) that the killing was done with deliberation. 18 Pa.C.S. § 2502(d); *Commonwealth v. Bronshtein*, 547 Pa. 460, 472, 691 A.2d 907, 913 (1997), *cert. denied*, 522 U.S. 936, 118 S.Ct. 346, 139 L.Ed.2d 269 (1997). Specific intent to kill can be proven where the defendant knowingly applies deadly force to the person of another. *Commonwealth v. Hall*, 549 Pa. at 281, 701 A.2d at 196. Death caused by the use of a deadly weapon upon a vital part of the victim's body is sufficient to prove the specific intent required for a conviction of first degree murder. *Id.* Furthermore, all co-conspirators to a murder may be found guilty of first degree murder, regardless of which person actually inflicted the wound which resulted in death. *Commonwealth v. Gibson*, 547 Pa. 71, 84, 688 A.2d 1152, 1158 (1997), *cert. denied*, 522 U.S. 948, 118 S.Ct. 364, 139 L.Ed.2d 284 (1997). Here, the eyewitness accounts, appellant's numerous statements admitting to the killing and forensic evidence amply established appellant's conviction for attempted rape and first degree murder. Appellant claims that since there are inconsistencies between various witnesses' testimony, this Court should find the evidence insufficient to convict appellant.[6] Although appellant phrases this as a sufficiency argu-

6. For example, appellant contends that the evidence was insufficient to establish that the crimes occurred in the early hours of August 6, 1981, as argued by the Commonwealth at trial. While there were some inconsistencies among the witnesses' testimony in establishing August

ment, the challenge goes to the weight of the evidence. Section II, *infra*. Accordingly, appellant's challenge to the sufficiency of the evidence must fail.

## II. WEIGHT OF THE EVIDENCE

■■ Appellant also contends that the verdict was against the weight of the evidence. The weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. *Commonwealth v. Johnson,* 542 Pa. 384, 394, 668 A.2d 97, 101 (1995), *cert. denied,* 519 U.S. 827, 117 S.Ct. 90, 136 L.Ed.2d 46 (1996). An appellate court cannot substitute its judgment for that of the finder of fact. *Commonwealth v. Pronkoskie,* 498 Pa. 245, 251, 445 A.2d 1203, 1206 (1982). Thus, we may only reverse the lower court's verdict if it is so contrary to the evidence as to shock one's sense of justice. *Commonwealth v. Hawkins,* 549 Pa. 352, 368, 701 A.2d 492, 500 (1997), *cert. denied,* 523 U.S. 1083, 118 S.Ct. 1535, 140 L.Ed.2d 685 (1998).

■ Appellant asserts that inconsistent witness statements, memory problems of witnesses, drug and alcohol use of witnesses on the night of the murder and the alleged suggestive and coercive police interview tactics warrant a reversal. All of the matters complained of by appellant, however, were issues argued by appellant's counsel during trial and were properly weighed and rejected by the jury before it reached its verdict. *See Commonwealth v. Simmons,* 541 Pa. 211, 229, 662 A.2d 621, 630 (1995) (appellant's assertion that inconsistencies in a witness's testimony rendered him not credible as a matter of law has no merit since the inaccuracies claimed are only minor and a witness's credibility is solely for the jury to

6th as the date of the murder, there were several witnesses who testified that the victim was at the party on August 5th and to different portions of the events that followed thereafter. The inconsistencies raised by appellant do not rise to the level to warrant a new trial or establish that the evidence was insufficient to support the first degree murder charge. The exact time of death is not an element of first degree murder. Moreover, it is well established in this Commonwealth that "[a] mere conflict of testimony does not render the evidence insufficient". *Commonwealth v. Rankin,* 441 Pa. 401, 404, 272 A.2d 886, 887 (1971).

determine), *cert. denied,* 516 U.S. 1128, 116 S.Ct. 945, 133 L.Ed.2d 870 (1996); *Commonwealth v. Hudson,* 489 Pa. 620, 628, 414 A.2d 1381, 1385 (1980) (witness's ability to testify about events he witnessed after consuming drugs is a matter of credibility to be considered by the jury). A review of the record indicates that appellant has failed to establish that the jury's verdict was so contrary to the evidence to shock this Court's sense of justice so as to warrant a new trial.

## III. AFTER–DISCOVERED EVIDENCE

Appellant next claims that the trial court erred in not granting a new trial because of exculpatory after-discovered evidence. During the Post Sentence Motion proceedings, appellant presented testimony that shortly after the victim's body was discovered, the victim's family received anonymous threatening phone calls. On one occasion the caller told the victim's parents that their other daughter was next and on another occasion the caller said "I am so sorry. I didn't mean it—for it to happen to her." In addition, the victim's aunt, with whom the victim had been living for ten months preceding the murder, noticed what appellant characterizes as, "drive-by actions." Specifically, she testified that on several occasions, beginning a week after the victim's funeral, two or three men drove slowly past her house, shined flashlights into her house and hollered statements. These "drive-bys" occurred for about two weeks. Appellant argues that this evidence is exculpatory because it demonstrates that the callers and actors involved with the "drive-bys" were the culprits—not him.

Unless there has been a clear abuse of discretion, an appellate court should not disturb the trial court's denial of appellant's motion for a new trial based on after-discovered evidence. *Commonwealth v. Parker,* 494 Pa. 196, 199, 431 A.2d 216, 218 (1981). It is well settled in this Commonwealth that a new trial is not warranted on the basis of after-discovered evidence, unless the following conditions are met: (1) the new evidence could not have been discovered until after the trial despite reasonable diligence; (2) the new evidence is

not to be used for merely cumulative or impeachment purposes; and (3) the new evidence is of such a nature that it would compel a different outcome if it had been introduced at trial. *Commonwealth v. Albrecht,* 554 Pa. 31, 57–59, 720 A.2d 693, 707 (1998).

 In applying the after-discovered evidence test, appellant has satisfied the first condition, that the evidence could not have been discovered until after the trial despite reasonable diligence. Although the victim's family testified that they did not divulge the information to appellant until after he was convicted, and the proposed evidence is neither cumulative, nor is it to be used for purely impeachment purposes, appellant has failed to establish that the evidence is exculpatory. In order for after-discovered evidence to be exculpatory, it must be material to a determination of guilt or innocence. Appellant argues that if this evidence had been introduced at trial, the jury would likely have reached a different verdict by inferring that the person who killed the victim was also responsible for phone calls and drive-bys and, therefore, since appellant was incarcerated when the calls and drive-bys took place,[7] the jury would have concluded that another individual must be responsible for the crime.[8] Contrary to appellant's claim, the fact that appellant was incarcerated when some of the threatening phone calls were made and the "drive-bys" occurred does not support his assertion that he did not commit the murder. The jury could have easily concluded either: that appellant made the calls from jail, that another individual made the calls and did the "drive-bys" on either appellant's or the co-defendant's behalf, or that an individual unconnected to the crime could have contacted the family and driven by their home. Hence, even if this evidence was introduced at trial, appellant has failed to establish that a different verdict would

7. The parties stipulated that "John A. Small was incarcerated in a state correctional facility from December 14, 1981, when he was received from the Adams County Prison, until July 18, 1983, when he was released to the York Community Service Center."

8. Co-defendant James Frey was enlisted in the Navy when some of the calls and drive-by actions took place.

likely have occurred. Accordingly, the trial court, did not abuse its discretion in denying a new trial.

## IV. DENIAL OF JURY'S REQUEST FOR SPECIFIC INFORMATION

Appellant next claims that the trial court erred when it denied the jury's request that certain testimony be read back to it during its verdict deliberations. The jury asked to hear the testimony of Linda Rhinehart regarding a conversation she had with 'Scott' about a possible sighting of the victim and to hear the testimony from Larry Tucker, Cerenna Hughes, and James Hughes recounting the events of the night of the murder. The jury also asked to see several letters written by Mary Trisch Knight ("Knight") and Larry Tucker that were entered into evidence but which were not part of the material sent out with the jury.[9]

It is well established in this Commonwealth that "where a jury, in order to refresh their recollection, requests a reading of a portion of the testimony actually given at the trial, it is a matter within the discretion of the trial court whether to grant such request." *Commonwealth v. Peterman*, 430 Pa. 627, 631, 244 A.2d 723, 726 (1968). Moreover, in making a determination whether the trial court had abused its discretion in granting or denying the request, the court must be careful that the resulting review, "does not place undue emphasis on one witness' testimony." *Id.* at 631–632, 244 A.2d at 726.

9. In the Knight letter, Mary Trisch Knight wrote to a friend that she had seen the victim two days after she was allegedly murdered by appellant on August 6, 1981. At trial, Knight testified when shown the letter that although it was her handwriting, she did not remember writing the letter, nor did she remember relating to anybody that she had been with the victim on August 8, 1991. In the Tucker letters, Larry Tucker wrote to his girlfriend in 1989 from prison that in exchange for his freedom he was willing to cooperate with the police regarding the murder. He also wrote that another individual other than appellant and the co-defendant was involved in the murder. Nowhere in the letters does he mention appellant's involvement with the murder. At trial, he testified that he lied in the letter to his girlfriend that the other individual was involved in the murder.

The trial court, after consulting with both defense counsel and the district attorney, decided to deny the request and instructed the jury that it should rely on its "collective recollection" of the testimony. Specifically the trial court stated:

We have looked into your inquiries and the transcripts; in fact, two people have been working on that for about three-plus hours, and we find that we are unable comfortably to comply with the law and give you what you request; for this reason, there is always a danger when there is read back to the jury portions of the testimony that the jury will unduly highlight that testimony and give it more weight than the rest of the testimony.

And the testimony regarding the subjects that you raised, especially number two, was the subject of many, many witnesses, and not just the testimony of the three that you've requested; and, hence, there is the risk that you would highlight the testimony that's being read back and exclude consideration of the other testimony.

This doesn't mean that you have to find all of the testimony truthful, but you have to weigh it, and the concern is in the law that juries will unduly weigh the testimony that is read back to them.

With regard to the other two requests, some of the attorneys think they can be handled and some not. I have discretion in doing this, and my concern is that there are a number of writings that have been entered into evidence and we have not sent any of these writings that have been entered into evidence and we have not sent any of these writings out to you, and to send some of the writings out again will enable you to highlight that testimony, or even to read portions of those writings to you, again, will highlight that at risk of unduly weighing that testimony.

Therefore, we must say to you in response to your request that you're doing that you're going to have to rely on your collective recollection of what was said and what

was testified to in deciding what weight to give to the evidence and as to what has been proven or not proven.

After a sidebar discussion, the trial court went on to state:

> Ladies and gentlemen of the jury, I want to make clear to you, it is up to you to decide which testimony you find credible and believable, including testimony of the subjects that you've requested. It's up to you to decide. That is your prerogative.

Appellant offers a number of reasons as to why the testimony and the letters the jury requested would be important to the jury during its deliberations. For example, appellant argues that the requested letters were highly relevant to challenging Knight's and Larry Tucker's credibility, the requested material focused directly on key points raised by defense counsel and the jury stated they could not proceed without the requested testimony and evidence. Notwithstanding appellant's arguments, the trial court properly exercised its discretion and denied the jury's request on the basis that the jury would unduly highlight the requested testimony. *Peterman,* 430 Pa. at 631, 244 A.2d at 726. (In deciding whether to grant a jury's request that certain information be read back to it, the trial court must ensure that the jury will not place undue emphasis on it). Thus, this claim must fail.

## V. PRE–TRIAL DISCOVERY OBLIGATIONS

 Appellant next contends that the Commonwealth failed to fulfill its discovery obligations by not disclosing exculpatory evidence. In *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the United States Supreme Court held that a prosecutor's suppression of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, regardless of the good or bad faith of the prosecution. See also Pa.R.Crim.P. 305 (providing for mandatory discovery of evidence favorable to accused upon request).[10]

---

10. Nowhere in its appellate brief does appellant argue that the Commonwealth violated Rule 305. Rather, he argues that the Commonwealth violated his general Constitutional rights to discovery.

The omission, once established, must be evaluated in the context of the entire record. *Commonwealth v. Green*, 536 Pa. 599, 604, 640 A.2d 1242, 1245 (1994). A defendant seeking relief from a discovery violation must demonstrate prejudice. *Commonwealth v. Johnson*, 556 Pa. 216, 232, 727 A.2d 1089, 1097 (1999). There is no constitutional requirement that a prosecutor make a complete and detailed accounting to the defense of all police investigatory work on a particular matter. *See Commonwealth v. Appel*, 547 Pa. 171, 203, 689 A.2d 891, 907 (1997) ("The Brady rule is not an all-encompassing directive to the prosecution to disclose all evidence in its possession to a criminal defendant. The prosecution is not required under Brady to 'make a complete and detailed accounting to the defense of all police investigatory work on a case.'") (citing *Moore v. Illinois*, 408 U.S. 786, 795, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972)). Appellant's claim fails for a number of reasons. First, and most significantly, appellant fails to establish that any specific material was not disclosed. Second, he fails to show that the alleged evidence was either material or exculpatory. Finally, appellant fails to establish that even if the alleged material was disclosed, a different verdict would have likely occurred and, therefore, there was no prejudice. Hence, this claim affords appellant no relief.

Appellant also claims that the Commonwealth failed to fulfill its discovery obligations since potential, yet unidentified, impeachment information may have been lost or destroyed because of police officers' inability to recall in detail substantial portions of interviews with various witnesses. Specifically, appellant argues that the Commonwealth was required to produce evidence of events which possibly took place prior to tape-recorded witness interviews, i.e., what was said during the preliminary conversations before the official statement was recorded, and that providing tape-recorded interviews between the police and its witnesses was not enough to satisfy the prosecution's duty. Again, appellant's contention fails for a number of reasons. First, there was no indication that such evidence appellant complains about ever existed. A vague assertion of lost or forgotten material is not

sufficient to give rise to a *Brady* violation. Next, appellant has failed to establish that police had reason to expect that the alleged evidence would play a significant role in appellant's defense. *See California v. Trombetta*, 467 U.S. 479, 488, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984).("Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense.") Moreover, appellant has failed to establish that the exculpatory value of the alleged evidence was apparent before the alleged evidence was lost or destroyed. See *Id.*, 467 U.S. at 489, 104 S.Ct. 2528 ("To meet this standard of constitutional materiality . . . evidence must . . . possess an exculpatory value that was apparent before the evidence was destroyed").

Finally, even if the evidence existed and was material, appellant has also failed to establish that the police acted in bad faith. *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). In *Youngblood*, the United State Supreme Court stated that, unlike *Brady*, which dealt with the disclosure of material evidence, due process requires a different standard when the State fails to preserve evidentiary material. Under these circumstances, the United States Supreme Court held that "unless a criminal defendant can show bad faith on the part the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.* at 58, 109 S.Ct. 333.[11]

Appellant asked the trial court to direct the Commonwealth to reconstruct any oral conversations that were not recorded,

11. In *Commonwealth v. Deans*, 530 Pa. 514, 610 A.2d 32 (1992), this Court distinguished *Youngblood* and held that the defendant's constitutional due process rights were violated irrespective of good faith because the Commonwealth wanted to use the lost evidence to help establish the defendant's guilt. In *Deans*, the defendant was charged with forgery for allegedly attempting to collect a money prize on a forged lottery ticket, the Commonwealth lost the ticket, yet the Commonwealth still wanted to introduce expert testimony that the lottery ticket was forged. In *Youngblood*, however, as in the instant matter, the prosecutor did not attempt to make use of the incriminating evidence. Appellant fails to argue, nor does the record suggest, that the Commonwealth attempted to use the witnesses un-recorded statements to bolster or help prove its case. Therefore, *Deans* is distinguishable.

essentially requiring that the Commonwealth create evidence. As a principal matter, it was impossible for the police to recreate conversations that took place over a fifteen-year period. Moreover, if appellant's argument was accepted, police would be required either to tape every conversation between police investigators and *potential* witnesses or to take detailed notes of all activity on every investigation. This is not a realistic or necessary requirement to impose on the police. We believe that the Commonwealth complied with its discovery obligations by producing the recorded conversations. It is impossible, impractical and unnecessary for the police to record every word said to or by a person during an investigation, as much of it may be irrelevant or may simply corroborate other recorded information. Further, since appellant was provided with the witnesses' names, appellant was free to investigate on his own by interviewing witnesses before the trial about any unrecorded conversations and by cross-examining the witnesses at trial about conversations they had with the police prior to their official statements. Finally, appellant fails to show how this evidence, even if produced, would have caused a different outcome. *Com. v. Counterman*, 553 Pa. 370, 395–397, 719 A.2d 284, 297 (1998). Therefore, these claims afford appellant no relief.

## VI. WITNESSES' HISTORY WITH DRUGS AND ALCOHOL

Appellant claims that the trial court erred by prohibiting him from cross-examining Commonwealth witnesses regarding their extensive drug and alcohol abuse from the time of the incident in 1981 until trial, nearly fifteen years later. The trial court did permit questioning about the drug and alcohol consumed around the incident in 1981, but refused to permit appellant to cross-examine the witnesses about their drug and alcohol abuse at irrelevant times.[12]

---

12. Appellant wanted to show how at the time of the trial, the long sustained use of drugs and alcohol over the fifteen year period effected the witnesses' ability to remember the events surrounding the murder.

Although, this Court has "consistently held that intoxication on the part of a witness at the time of an occurrence about which he has testified is a proper matter for the jury's consideration", this Court has also held that the jury should **not** consider for impeachment purposes the use of drugs or alcohol at other irrelevant times. *Commonwealth v. Drew*, 500 Pa. 585, 591, 459 A.2d 318, 321 (1983). *See also Commonwealth v. Yost*, 478 Pa. 327, 337, 386 A.2d 956, 961 (1978) (trial court properly refused to allow cross examination as to whether witness had a severe drug problem, even though it permitted questioning about his use of drugs at the particular time that defendant allegedly admitted to the witness that he killed the victim). Hence, the trial court did not err in limiting cross-examination about Commonwealth witnesses' drug and alcohol abuse.

The trial court also refused to permit appellant's expert witness from testifying as to the long-term effects of such drug and alcohol abuse on memory. Since testimony about long-term drug and alcohol abuse was inadmissible, there was no relevance to having the expert testify and the trial court properly excluded this portion of his testimony.

## VII. PRE–TRIAL AND TRIAL IDENTIFICATIONS

 Appellant next claims that the trial court erred in denying his motion to suppress all pre-trial photographic identifications of him. "A reversal of the judgment of sentence is appropriate only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Commonwealth v. Martin*, 481 Pa. 515, 520, 393 A.2d 23, 26 (1978) (citing *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968)). In *Commonwealth v. Moore*, 534 Pa. 527, 633 A.2d 1119 (1993), *cert. denied*, 513 U.S. 1114, 115 S.Ct. 908, 130 L.Ed.2d 790, *reh'g denied*, 514 U.S. 1010, 115 S.Ct. 1329, 131 L.Ed.2d 208 (1995), this Court stated that:

We recognize that in response to this challenge, the Commonwealth bears the burden of establishing that any identi-

fication testimony to be offered at trial is free from taint of initial illegality. *Commonwealth v. Turner*, 454 Pa. 520, 314 A.2d 496 (1974); Pa.R.Crim.P. 323(h) ... In making this determination, the court should normally consider the manner in which the identification procedure was conducted, the witness' prior opportunity to observe, the existence of any discrepancies between the witness' description and the defendant's appearance, any previous identification, any prior misidentification, any prior failure of the witness to identify the defendant, and the lapse of time between the incident and the court identification. *Commonwealth v. Fowler*, 466 Pa. 198, 352 A.2d 17 (1976); *United States v. Higgins*, 458 F.2d 461 (3d Cir.1972).

*Id.* at 540, 633 A.2d at 1125–1126.

Appellant first alleges that the pre-trial identifications should have been suppressed because of the impermissibly suggestive manner in which photographs of appellant and the other conspirators were shown to witnesses.[13] He argues that the police did not use a traditional photographic line-up which would test the witnesses' ability to identify a suspect. The evidence at the suppression hearing demonstrated that approximately seventeen photographs were shown to the various witnesses—eleven were photographs developed from a camera that was retrieved from the victim's bedroom loaded with film and six photographs were police identification photos of the four individuals originally charged with the murder. Appellant claims that his photograph was suggestive of guilt since it was a "mug shot" photograph taken in 1995, while the other photographs shown to the witnesses were taken in 1981 and depicted outdoor, casual or group scenes. Contrary to appellant's claims, the record supports the trial court's finding that the purpose of the photographic display was not to place the defendants at the scene of the homicide, but rather, to determine if the potential witnesses knew the individuals depicted in the various photographs, to identify the individuals depicted in the photographs retrieved from the victim's camera, and to

---

**13.** In addition to appellant and the co-defendant, Larry Tucker and Charles Small were also charged with the murder of the victim.

determine whether persons displayed in the photographs attended the party on the night of the killing or went to the Pines following the party.

Appellant also claims that the pre-trial identification was flawed because the police failed to ascertain, prior to showing the witnesses the photographs, whether drug or alcohol consumption at the time of the murder precluded the potential witnesses from being able to remember accurately the events on the night of the killing which occurred fourteen years earlier. The trial court properly prohibited appellant from questioning a police officer about this subject at the suppression hearing by sustaining an objection by the Commonwealth on the basis that this issue would not have a direct relationship to the issue of whether the identification procedure was suggestive and should be suppressed.[14] Finally, appellant alleges the pre-trial identifications should have been suppressed because of the unavailability of numerous photographs shown to witnesses since 1981 and the failure of police to keep records of all photographs shown to witnesses from 1981 to 1995. Although the better practice for police would have been to keep accurate records of any photographs shown to each witness for identification purposes, the photographs in question were shown to ascertain general information about the victim and the night of the murder, rather than to establish the identity of appellant as the perpetrator, hence, we do not find a new trial is warranted for the failure of the police to do so in this matter.

Appellant also contends that the trial court erred in denying his motion to suppress certain in-court identifications of him since they were tainted by the suggestive nature of the pre-trial photographic identifications and there was no adequate, independent basis for the witnesses to identify appellant at trial. However, appellant fails to develop this argument; nor does the record support this claim. Since the

14. The trial court did state that the defense would be permitted to question on this issue at trial, which would adequately enable the defense to attack the credibility of individual witnesses' identifications of appellant.

witnesses were acquainted with appellant prior to the commission of the crime, there is an independent corroboration that the in-court identification was not tainted.[15] *See Commonwealth v. Wilson*, 538 Pa. 485, 502, 649 A.2d 435, 444 (1994) ("[A]n in-court identification following a suggestive out of court identification will be admissible only if, considering the totality of the circumstances, it is determined that the in-court identification had an origin sufficiently distinguishable to be purged of the primary taint." (citations omitted)), *cert. denied*, 516 U.S. 850, 116 S.Ct. 145, 133 L.Ed.2d 91 (1995). Therefore, in viewing the totality of the evidence, appellant has failed to establish that pre-trial and trial identifications were so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification and hence, this claim affords appellant no relief.

## VIII. ADMISSION OF PHOTOGRAPHS

Appellant next argues that the trial court erred in allowing the Commonwealth to show the jury black and white photographs of the victim's decomposed corpse. Appellant asserts that the pictures were "extremely gruesome" and that the pictures offered little probative value since they did not necessarily show the crime scene at the time of the death, but rather depicted a badly decomposed body, which was found approximately forty-two days after the murder.

"The admissibility of photos of the corpse in a homicide case is a matter within the discretion of the trial court, and only an abuse of discretion will constitute reversible error." *Commonwealth v. Rush*, 538 Pa. 104, 111, 646 A.2d 557, 560 (1994). In deciding whether to admit such photographs, "the determinative inquiry is whether the photos have evidentiary value that outweighs the possibility of inflaming the minds and passions of the jurors." *Id.* In *Commonwealth v. McCutchen*, 499 Pa. 597, 602, 454 A.2d 547, 549 (1982), this Court stated that:

**15.** The various witnesses testified that they had seen appellant throughout the night of the murder—at the party, at the tavern, and at the Pines.

To permit the disturbing nature of the images of the victim to rule the question of admissibility would result in the exclusion of all photographs of the homicide victim, and would defeat one of the essential functions of a criminal trial, inquiry into the intent of the actor. There is no need to so overextend an attempt to sanitize the evidence of the condition of the body as to deprive the Commonwealth of opportunities of proof in support of the onerous burden of proof beyond a reasonable doubt.

In the instant matter, the Commonwealth utilized the photographs to establish the necessary intent. Appellant claims that this evidence was cumulative because there was testimony from the coroner as to the body's condition. However, "the condition of the victim's body provides evidence of the assailant's intent, and, even where the body's condition can be described through testimony from a medical examiner, such testimony does not obviate the admissibility of photographs." *Commonwealth v. Jacobs*, 536 Pa. 402, 407, 639 A.2d 786, 789 (1994). Moreover, the positioning of the body was essential to the Commonwealth establishing the attempted rape charge and the photographs, therefore, assisted the jury in having a better understanding of the crime scene and the positioning of the body.[16] "A jury can often best perform its function if it has not been unduly insulated from gaining a full understanding of the crime". *Id.* Finally, even though the body had begun to decompose, the photographs were still probative of the attempted rape and first degree murder convictions since they helped to establish the necessary intent element of the crimes. *See Commonwealth v. King*, 554 Pa. 331, 350–352, 721 A.2d 763, 773 (1998) (photographs of a murder victim's body were admissible, even though they showed signs of decomposition, since they depicted the manner in which the victim was tied, which was essential to establishing the intent element of first degree murder.) Accordingly, we find that

16. In this section of his brief, appellant argues that the trial court erred in allowing the Commonwealth to amend its Informations to include the attempted rape charge. However, as noted below, we find that there was no error in amending the Informations and hence the photographs were admissible to aid in establishing this charge.

the trial court did not abuse its discretion in admitting the photographs.

## IX. AMENDING CHARGES TO INCLUDE ATTEMPTED RAPE

Next, appellant asserts that the trial court erred when it allowed the Commonwealth to amend the Informations to add attempted rape as the underlying felony to support the second degree murder charge. Appellant was originally charged with rape, but the charge was dismissed after the trial court determined that there was no evidence, direct or circumstantial, from which an inference could arise that penetration had occurred. Appellant complains that by allowing the Commonwealth to add the attempted rape charge, he was prejudiced in a number of ways. First, he claims that the addition of the attempted rape charge allowed the Commonwealth to admit certain evidence that would not have otherwise been admissible but for the attempted rape charge. Specifically, the court's decision to admit the photographs of the victim's decomposed body was based on the argument that the specific positioning of the body was probative of the attempted rape charge.[17] Second, appellant claims the addition of the amendment allowed two additional felony counts to go before the jury (second-degree murder [18] and attempted rape) possibly confusing and inflaming the jury.[19] Third, appellant claims

17. As noted above, however, while the pictures did help establish the attempted rape charge, they also helped the jury understand the nature of the crime and the intent element of the murder charge and were, therefore, admissible regardless of the attempted rape charge.

18. Appellant is apparently confused on this issue. Second degree murder is not an additional felony count. Second degree murder, or felony murder as it is sometimes described, is a lesser degree of murder carrying a penalty of life imprisonment.

19. After the rape charge was dismissed, without the underlying attempted rape felony, the second degree murder charge would have also been dismissed. See 18 Pa.C.S. § 2502(b)—"A criminal homicide constitutes murder of the second degree when it is committed while defendant was engaged as a principal or an accomplice in the perpetration of a felony." In permitting the Commonwealth to amend the Informations, the trial court also properly denied appellant's Motion to Quash the Second Degree Murder Charge.

that the amendment provided an additional aggravating circumstance for the jury to consider in voting to sentence appellant to death.

Rule 229 of the Rules of Criminal Procedure governs the permissibility of the amendment of criminal informations, and provides:

> The court may allow an information to be amended when there is a defect in form, the description of the offense, the description of any person or any property, or the date charged, provided the information as amended does not charge an additional or different offense. Upon amendment the court may grant such postponement of trial or other relief as is necessary in the interests of justice.

The decision of whether to allow the Commonwealth to amend the Informations is a matter within the discretion of the trial court, and only an abuse of discretion will constitute reversible error. Here, the trial court did not abuse its discretion in allowing the Commonwealth to amend the Informations to include a charge of attempted rape after the rape charge was dismissed. There was sufficient evidence for the jury to find that appellant and the co-defendant were attempting to rape the victim when she was murdered and appellant, by virtue of the original rape charge, was on notice that the Commonwealth intended to pursue a sexual assault related offense. Thus, appellant's claim must fail.

## X. TESTIMONY OF SPECIFIC WITNESSES AT GUILT PHASE

Appellant claims that the trial court erred in permitting Linda Rhinehart to testify that sometime between mid-August of 1981 and mid-September of 1981 she overheard appellant and some other men discussing the killing. Specifically, Rhinehart testified as follows:

> [I heard him say] "Oh, we drove around and partied for awhile, she [the victim] had to pee, so we pulled over to let her go in the woods." He then said, "I followed her into the woods 'cause I was going to get some of that, and he came back and told his buddies, let's share this." The first male

voice said, "No, come on, she's not sharing with her boy-friend right now." [appellant] sort of chuckled.

And that's when I got my pizza to turn around and saw that it was [appellant] talking, and he made the statement, "She won't be a tease anymore. It's amazing what a tire iron can do to hush someone making that much noise."

The witness testified at trial that although she had never personally met appellant, several people had identified him to her prior to overhearing the conversation.[20]

Appellant contends that the trial court erred in allowing Rhinehart's testimony because it was hearsay and it violated appellant's confrontation rights. Appellant argues in his appellate brief that:

If the Commonwealth wanted such evidence to be admitted, it was their burden to lay a proper foundation which included having witnesses testify that they knew Defendant and told Ms. Rhinehart the speaker was defendant.

Therefore, appellant argues that he was prejudiced since he was not able to cross-examine the witnesses about whether they actually told Rhinehart that the speaker was appellant. It is difficult to comprehend appellant's logic that he was prejudiced by this alleged failure on the part of the Commonwealth and the trial court. Appellant's counsel thoroughly and adequately cross-examined Rhinehart about her ability to identify appellant. Moreover, she testified at trial that Mary Trisch Knight identified appellant to her.[21] Knight was called as a witness at trial during both the Commonwealth's and appellant's cases. If appellant felt the need to examine

**20.** Since the witness became blind between the time of hearing the statement and trial, she was unable to observe appellant at trial and confirm that the declarant of the statement she heard was appellant.

**21.** Prior to the testimony of Rhinehart in front of the jury, in response to appellant's objection, the trial court conducted an In Camera hearing where Rhinehart was examined by both the Commonwealth and defendants' counsel. During this testimony, Rhinehart testified that not only did Knight identify appellant on one occasion, but he was also identified to her on two separate occasions by Wanda Runkle and Paul Myers, Jr, prior to her blindness. It is not clear from the record why she only identified Knight when questioned several minutes later in front of the jury.

Knight about whether she did in fact identify appellant to Rhinehart, that information was directly ascertainable and could have been made available to the jury. Therefore, appellant was not prejudiced by the admission of this evidence.

Appellant also contends that the trial court erred in prohibiting Laura Craig from testifying. Appellant sought to use Craig's testimony to impeach a witness for the Commonwealth, Edward Moore.

Moore, a fellow prisoner, testified that appellant, prior to trial, offered him ten thousand dollars to f—k up Larry Tucker, the Commonwealth's principal witness, which Moore refused. Moore was initially visited by police officers regarding the offer, but he refused to cooperate. After appellant learned that Moore had been approached by the police, he confronted Moore.[22] Later that night, Moore requested that he be transferred to a different part of the prison for "medical reasons."

At trial, appellant's counsel made an offer of proof that Craig, a nurse at the prison, would testify that when Moore requested the transfer, he did not mention any threats or problems with appellant, but he did indicate that the police were pressuring him to testify and he was unclear regarding essentially what they wanted him to testify about. The trial court ruled that Craig's proposed testimony would not impeach Moore's testimony because appellant's counsel acknowledged that Moore was not asked on direct examination "if he was fearful of John Small." Moreover, Moore testified on direct that he did feel pressure from the police, when they first questioned him since he "didn't want to get involved." Therefore, the trial court properly concluded that there was no statement by Moore that Craig's testimony would impeach. Hence, we hold that appellant has failed to establish that the trial court abused its discretion in denying the testimony.

**22.** While it is not clear from the record how appellant learned that Moore had met with the police, Moore believed that his attorney tipped off appellant's counsel about the visit. There is no proof in the record to support this charge other than Moore's testimony.

## XI. DENIAL OF CONTINUANCE

 Lastly, appellant complains that the trial court erred in denying his motion for a continuance. On May 6, 1996, the day before his trial was to start, appellant filed a request for a continuance in order to investigate: (1) an early 1980s DUI case which allegedly involved an individual who had information regarding the murder in this case, and (2) recent statements by Linda Rhinehart, the nature of which appellant fails to identify.[23] It has long been the view of this Court that a decision to grant or deny a continuance to secure a witness is a matter within the sound discretion of the trial court and will not be reversed by an appellate court absent prejudice or an abuse of discretion. *Commonwealth v. Gibson*, 547 Pa. 71, 90, 688 A.2d 1152, 1162 (1997), *cert. denied*, 522 U.S. 948, 118 S.Ct. 364, 139 L.Ed.2d 284 (1997). "In reviewing the denial of a continuance, we have regard for the orderly administration of justice as well as the right of a criminal defendant to have adequate time to prepare his defense." *Commonwealth v. Crews*, 536 Pa. 508, 524, 640 A.2d 395, 403 (1994). Moreover, when reviewing a trial court's decision to deny a request for a continuance, we must consider the following factors:

(1) the necessity of the witness to strengthen the defendant's case;

(2) the essentiality of the witness to the defendant's defense;

(3) the diligence exercised to procure his or her presence at trial;

(4) the facts to which he or she could testify; and

(5) the likelihood that he or she could be produced at court if a continuance were granted.

*Commonwealth v. Thomas*, 552 Pa. 621, 717 A.2d 468 (1998) (citing *Commonwealth v. Scott*, 469 Pa. 258, 365 A.2d 140 (1976).) Applying these criteria to the facts in the instant

**23.** Appellant does not elaborate on the relevance or content of Rhinehart's "recent statements" or how he was prejudiced by the trial court's failure to grant the motion with respect to this piece of evidence.

matter, we conclude that the trial court did not abuse its discretion in denying the continuance.

Appellant contends that the alleged unidentified DUI witness would testify that someone else killed the victim, namely, two brothers, one of whom later committed suicide. Appellant argues that this evidence was significant because it implicated Larry Tucker, the Commonwealth's principal witness, because Larry Tucker's brother, Andy Tucker, committed suicide in December 1981. Appellant claims that his trial counsel exercised due diligence in trying to locate the witness but that he did not discover the possible witness until "the latter part of 1995" when he learned of the existence of a Maryland police report indicating that an individual, incident to an arrest, indicated that he had knowledge about the homicide. The motion further stated that counsel contacted the "(STATE?) local police" to try to confirm the report without success.[24] Three days before requesting a continuance, defense counsel received from the State Police the DUI logs of a Maryland police officer who confirmed that he had arrested an individual during the early 1980s who had stated he had some knowledge about a murder that had occurred where the victim was killed and that the murder had been committed by two brothers, one of whom committed suicide. The DUI logs contained 200 names, all of whom appellant's counsel argued needed to be interviewed to determine which person was the potential witness since the officer could not specifically identify which person made the statement.

Contrary to appellant's claim of due diligence, there is no explanation in the motion for the continuance, or in his appellate brief, as to why defense counsel was unable to obtain information about the alleged witness earlier than three days before trial. Vague unsupported assertions that counsel contacted the "(STATE?) local police" are not enough to establish that counsel exercised the requisite due diligence in attempting to locate the witness. Finally,. before the trial court

24. It is not clear what appellant's counsel meant when he stated in his motion for a continuance that "Counsel contacted the (STATE?) local police to try to confirm this report without success."

denied the request, trial counsel conceded that, even if the continuance was granted, there was no guarantee that the witness would be located. Accordingly, the trial court properly exercised its discretion in denying the request for a continuance.[25]

## XII. SENTENCE

 Finally, pursuant to 42 Pa.C.S. § 9711(h)(3), this Court has a duty to affirm the sentence of death unless we determine that:

(i) the sentence of death was the product of passion, prejudice, or any arbitrary factor;

(ii) the evidence fails to support the findings of at least one aggravating circumstance specified in subsection (d); or

(iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.[26]

After reviewing the record below, we conclude that the sentence imposed was not the product of passion, prejudice or any other arbitrary factor. In addition, we further conclude that the evidence was sufficient to establish the aggravating factors found by the jury that appellant had a significant history of felony convictions involving violence [27] and that the murder was committed in the perpetration of a felony.

Moreover, in accordance with *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 26, 454 A.2d 937, 942 (1982), *cert. denied,* 461

**25.** There is no indication in appellant's brief that the alleged witness was ever found even though the witness allegedly came to defense counsel's attention almost four years ago.

**26.** Effective June 25, 1997, the General Assembly repealed 42 Pa.C.S. § 9711(3)(h)(iii), pursuant to which this review is required. However, we continue to review for proportionality all cases on direct appeal in which the sentence of death was imposed prior to that date. *See Commonwealth v. Gribble,* 550 Pa. 62, 703 A.2d 426 (1997) (Act 28 does not apply retroactively).

**27.** The evidence established that appellant had been previously convicted of eight separate counts of burglary—all felonies in the first degree.

U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), *reh'g denied,* 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983), we must conduct a proportionality review as to appellant's sentence of death. A review of the data collected by the Administrative Office of the Pennsylvania Courts reveals that appellant's verdict was not disproportionate to the penalty imposed in similar cases. *See e.g., Commonwealth v. Miller,* 555 Pa. 354, 724 A.2d 895 (1999); *Commonwealth v. Robinson,* 554 Pa. 293, 721 A.2d 344 (1998); *Commonwealth v. Gwynn,* 555 Pa. 86, 723 A.2d 143 (1998); *Commonwealth v. Baez,* 554 Pa. 66, 720 A.2d 711 (1998).

Accordingly, we affirm the verdict and the sentence of death imposed upon appellant by the Court of Common Pleas of York County.[28]

Justice SAYLOR files a concurring opinion.

Justice ZAPPALA files a dissenting opinion.

SAYLOR, Justice, concurring.

I agree with Mr. Justice Zappala that prior decisions of this Court do not preclude the questioning of a witness about extensive drug or alcohol use during the period of time between the events at issue and the trial, where the purpose of such questioning is to demonstrate that such drug or alcohol use has impaired the witness's ability to remember accurately the events at issue. Before such questioning is permitted, however, the party seeking to challenge a witness on such basis should be required to make an offer of proof that the witness has in fact engaged in chronic substance abuse. As defense counsel made no such offer concerning either of the two witnesses in question, I conclude that this issue does not entitle Appellant to relief.

**28.** The Prothonotary of this Court is directed to transmit to the Governor's office the full and complete record of the trial, sentencing hearing, imposition of sentence and review by the Supreme Court pursuant to 42 Pa.C.S. § 9711(I).

ZAPPALA, Justice, dissenting.

Because I believe that the trial court abused its discretion by not permitting Appellant to question witnesses regarding their continuous chronic alcohol or drug use throughout a fifteen-year period, I dissent.

The majority relies upon *Commonwealth v. Drew*, 500 Pa. 585, 459 A.2d 318 (1983), and *Commonwealth v. Yost*, 478 Pa. 327, 386 A.2d 956 (1978) (plurality opinion), to support its conclusion that the trial court did not err in limiting questioning about the alcohol and drug use of witnesses. Neither case, however, addresses the issue presently before this Court, that is, whether a witness may be questioned about his or her continuous chronic alcohol or drug use throughout a prolonged period of time between the event about which he or she testifies and the trial, so as to attack the credibility of the witness by establishing, through expert testimony, that the witness's memory or ability to recollect past events could be defective because of the alcohol or drug use.

In *Drew*, the defendant was convicted of killing her husband, despite her claim that she had acted in self-defense. At trial, the defendant testified that her husband had assaulted her and that only seconds had passed from the time of the assault to the time that she killed him. A prosecution witness, however, testified that over twenty minutes had passed between the assault and the killing. In an attempt to discredit the defendant's testimony, the prosecution questioned the defendant about her intoxication on the night of the crime. On appeal, this Court found that because the prosecution limited its questioning to intoxication on the night of the crime and because "[t]he question of the consumption of alcoholic beverages within this time frame would be relevant to the question of whether [the defendant] did in fact have a reasonable belief of an immediate threat to her life," the trial court did not err in permitting the questioning. 500 Pa. at 592, 459 A.2d at 321–22.

Similarly, in *Yost*, the defendant was convicted of murder in the first degree, two counts of murder in the second degree

and criminal conspiracy. At trial, a prosecution witness testified that he had heard the defendant admit to having killed the victims. The trial court precluded defense counsel from questioning the witness about general drug use, but allowed questioning about the witness's drug use at the specific time that he had heard the admission. This Court affirmed. The plurality opinion reasoned that evidence of drug use at the particular time of the admission was relevant to whether the witness's mental condition at that time had been impaired so as to affect his ability to remember what he saw or heard. 478 Pa. at 336–338, 386 A.2d at 961. The opinion further explained that questioning the witness about general drug use "would have brought out any drug problem that [the witness] might have had at an irrelevant time and was, therefore, properly excluded." *Id.*

Both *Drew* and *Yost* are distinguishable for three reasons.[1] First, these cases did not involve continuous chronic alcohol or drug use. Rather, the witnesses in *Drew* and *Yost* were questioned about alcohol or drug use on a particular occasion, such as at the time of the crime or the admission about which the witness had testified.[2] The distinction between a specific instance of alcohol or drug use and continuous chronic alcohol or drug use is important. Continuous chronic use could have a strong negative effect on a witness's memory or ability to accurately recall past events, regardless of whether the wit-

[1] Indeed, all of the cases in this Commonwealth of which I am aware that address the issue of whether a witness can be questioned about his or her alcohol or drug use for the purpose of attacking the witness's credibility are distinguishable for these same reasons. *See, In the Interest of M.M.*, 547 Pa. 237, 690 A.2d 175 (1997) (plurality opinion); *Commonwealth v. Gaddy*, 468 Pa. 303, 362 A.2d 217 (1976) (plurality opinion); *Commonwealth v. Perdue*, 387 Pa.Super. 473, 564 A.2d 489 (1989); *Commonwealth v. Duffy*, 238 Pa.Super. 161, 353 A.2d 50 (1975); *Commonwealth v. Dreibelbis*, 217 Pa.Super. 257, 269 A.2d 387 (1970).

[2] Vague, general questions about drug use, such as those disallowed in *Yost*, are also distinguishable from specific questions about a witness's continued chronic alcohol or drug use, supported by expert testimony, such as the questioning proposed here. The former is often intended to merely blacken the reputation of a witness, while the latter is expressly intended to show that a witness's memory or ability to recollect past events may be defective.

ness was under the influence of alcohol or drugs at the time of the event that he or she is attempting to recall. Conversely, the effect of a single instance of alcohol or drug use is more limited, as it would only affect a witness's ability to remember what he or she observed while under the influence. This distinction alone nullifies any controlling guidance that *Drew* or *Yost* might offer.

Second, *Drew* and *Yost* are distinguishable because they did not involve a prolonged period of time between the event about which the witness testified and the trial. Since *Drew* and *Yost* did not involve a prolonged delay, they could only have addressed the witness's ability to perceive the event about which they testified. Appellant's case, on the other hand, involved a fifteen-year delay, which would have brought the witnesses' memories and abilities to accurately recall past events into issue. The effect of continuous chronic alcohol or drug use on a witness's memory or ability to accurately recall events that occurred fifteen years beforehand was simply not addressed in *Drew* or *Yost.*

The final reason *Drew* and *Yost* are distinguishable from the case at bar is that the prosecution in *Drew* and defense counsel in *Yost* did not offer or intend to offer expert testimony regarding any effects of alcohol or drugs on a witness. Here, defense counsel did call an expert, Dr. Passananti, to testify about the effects of alcohol and drugs on a witness's memory, ability to accurately recall past events and ability to perceive events.[3] This proffer is important because the effect of continued chronic alcohol or drug use on a witness's memory or ability to accurately recall past events is not a matter which a lay juror would normally understand without the assistance of an expert.

In my view, Appellant's claim of error presents a novel question of law and the majority errs in relying on *Drew* and *Yost* to decide it. I would hold that a witness may be questioned about his or her continuous chronic alcohol or drug use throughout a prolonged period of time between the event

---

3. The trial court only permitted Dr. Passananti to testify on the effects of alcohol and drugs on a witness's ability to perceive events.

about which he or she testifies and the trial, so as to attack the credibility of the witness by establishing, through expert testimony, that the witness's memory or ability to recollect past events could be defective because of his or her continuous chronic alcohol or drug use during that prolonged period of time.[4] Because in my view the proposed questioning and expert testimony were relevant and would have aided the jury in deciding the case, the trial court abused its discretion by precluding defense counsel from pursuing these lines of inquiry.

Accordingly, I would reverse the judgment of sentence and remand for a new trial.

**4.** I express no opinion on whether a witness may be questioned about continuous chronic alcohol or drug use throughout *any* prolonged period of time, for purposes of challenging his or her memory generally. I address only the propriety of such questioning regarding the particular period of time between the event about which the witness testifies and the trial.