J-A28008-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| MELVIN ORTIZ | |
| Appellant | No. 3469 EDA 2012 |

Appeal from the Judgment of Sentence June 5, 2012
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0002596-2010

BEFORE:  GANTMAN, P.J., WECHT, J., and JENKINS, J.

MEMORANDUM BY GANTMAN, P.J.:          **FILED OCTOBER 31, 2014**

Appellant, Melvin Ortiz, appeals from the judgment of sentence entered in the Philadelphia County Court of Common Pleas, following his jury trial conviction of third-degree murder and endangering the welfare of a child ("EWOC").[1]  We affirm.

The trial court opinion set forth the relevant facts and procedural history of this case as follows.

> Charles Brennan, Philadelphia firefighter and EMT, testified that on October 9, 2009, at approximately 5:16 P.M., he went to 6738 Kindred Street in Philadelphia in response to an emergency call.  When [Brennan] got to that location, he went to the door of the house and saw [Appellant] holding a baby in his arms.  Also, inside the house was a [2-3 year old] child.  [Appellant] told [Brennan] the baby

---

[1] 18 Pa.C.S.A. §§ 2502(c) and 4304(a)(1) respectively.

was not breathing. [Appellant] told [Brennan] that [Appellant] was an EMT. [Appellant] gave one (1) [rescue] breath into the baby's mouth and then placed the baby into Brennan's arms. Brennan placed the baby on the couch, and checked the baby's vital signs. He could not find a pulse, and the baby was not breathing. He saw slight bruising on the baby's body below her left clavicle. Brennan performed CPR on the baby. [Appellant] told him that the baby fell in the playpen and that the baby had sustained her injuries a few minutes before Brennan arrived. Brennan saw a playpen standing upright that did not appear to have been disturbed. Paramedics arrived on the scene and transported the baby to St. Christopher's Hospital for Children.

At 8:15 P.M., on the day of the incident, [EMT] Brennan prepared a handwritten statement. In that statement, and in a subsequent interview on October 14, 2009, with a detective from the Special Victims Unit, Brennan indicated that [Appellant] said to him when he arrived at the scene, that the baby did not have a pulse and the baby had fallen into the playpen a few minutes before Brennan arrived.

Paramedic Alan Elhyani testified that he is employed by the Fire Department of the City of Philadelphia. On October 9, 2009, at approximately 5:16 P.M. he was notified that his services were required at 6738 Kindred Street. He arrived on the scene in an ambulance and saw two (2) firemen performing CPR and breathing for a baby lying on the couch inside the house. He picked up the baby, ran out and placed the baby in the ambulance. The baby was transported to St. Christopher's Hospital for Children.

[Paramedic] Elhyani testified that he observed bruising on the baby's left forearm, left shoulder, and redness or bruising on the back of the baby's head. He reported these observations to the hospital staff.

Charles Tuttle, a fire service paramedic, employed by the City of Philadelphia, testified that he was dispatched to the location of 6738 Kindred Street on October 9, 2009. On October 14, 2009, he gave a statement to Special Victims Detective Collins indicating that he saw bruising on the

chest, forearm, neck, and head of the baby and that the injuries appeared to be in different stages of healing.

The defense called Yessina Ortiz, [Appellant's] daughter. She testified that she received a call from [Appellant] at approximately 5:00 P.M. on the day of the incident. She could hear [Appellant] in the background saying [the baby] is not breathing. She could tell he was not speaking into the phone but was off to the side. She hung up and called 911.

[Appellant] testified that between 4:00 P.M. and 5:00 P.M., on the day of the incident, he was downstairs with the [baby] and [2-3 year old]. The [baby] was sleeping in her [playpen]. He was watching TV with [the 2-3 year old]. [Appellant] walked into the kitchen to make the [baby] a bottle. After making the bottle, he came around the corner and saw [the 2-3 year old] with his feet on the bottom rail and his hands on the top rail of the [playpen] causing the [playpen] to tip over. When he got to the [baby], the [playpen] had tipped over and he saw the side of the [baby's] head hit the rail of a child's rocking chair then hit the hardwood floor. He grabbed the [baby] from the floor under her arms, and shook her lightly twice. When she did not respond, he put her on a table and checked her pulse. She did not have a pulse. He performed some compressions and some breaths on the [baby], after which her pulse came back. He hit redial on his phone because he knew that [the 2-3 year old] had talked to [Appellant's] daughter earlier. [Appellant] told his daughter to call 911 because he did not have time to explain the situation to the 911 operator and did not want to stop breathing for the [baby]. An EMT knocked on the door. He walked to the door holding the [baby] in his arms and handed the [baby] over to the EMT after giving the [baby] one last rescue breath.

Dr. Marlon Osbourne, an assistant medical examiner for the City of Philadelphia Medical Examiner's Office, testified that he performed the autopsy on the baby…and prepared an autopsy report. He testified that the [baby] was pronounced dead on October 14, 2009, at the age of two (2) months and five (5) days.

- 3 -

Dr. Osbourne testified that he found bruises on the inside of the [baby's] right arm; the inside of her wrist; the lower part of her left side; and, on the lower part of her abdomen on the left side. There was bruising underneath the skin on the scalp and a t-shaped fracture on the right side of her head. There was a hemorrhage along the muscles and the nerves and veins of each of her armpits. He noted a hemorrhage to the small piece of tissue that connects the side of the lip to the upper gum. Fractures were also discovered at the ends of both femurs and tibias. In his opinion, all of the injuries indicated trauma.

Dr. Osbourne opined to the ADA's hypothetical as to whether the injuries sustained by the [baby] were consistent with an infant falling out of a playpen and onto a small child's chair as not consistent with the fractures that were present in the [baby] and that the injuries were consistent with inflicted head trauma. In his opinion, based on all the injuries to the [baby's] head, brainstem and upper spinal cord, it was his opinion that the cause of death was craniocerebral trauma and that the manner of death was homicide.

Dr. Lucy Rorke-Adams, senior neuropathologist at Children's Hospital and a consultant in forensic pediatric neuropathology for the Medical Examiner's Office, testified that she was asked to perform an evaluation on tissue samples of the [baby's] brain, spinal cord, eyes and coverings of the brain of the [baby].

Dr. Rorke-Adams testified that there were blood clots on both sides of the brain, severe swelling of the brain and a hemorrhage on the right side and on the underside of the brain. The parts of the brain that connect to the spinal cord were tenuously attached and there was damage to the optic nerves of both eyes. She opined that these types of injuries were consistent with shaken baby syndrome or abusive head trauma which is the infliction of force by shaking the baby vigorously, or hitting the baby or slamming the baby into an object. She opined that a short fall of one (1) to three (3) feet into or out of the playpen would not have generated enough force to cause the injuries. She found to a reasonable degree of medical

certainty that the injuries sustained by the [baby] were consistent with child abuse.

Dr. Mary McColgan, director of the Child Protection Program at St. Christopher's Hospital for Children, testified that she saw the [baby] on October 9, 2009, at 9:00 P.M. The [baby] was unresponsive and had a hematoma on her right ear and behind her right ear. She had retinal hemorrhages to the back and inside of her eyes. She had a tear to the frenulum of her lower lip and a healing laceration inside her right lower cheek, at the jaw line. She had [areas] of blotchy redness on her chest and a circular bruise on her left wrist. She had a brown bruise on her right upper chest and a greenish/brown healing bruise on her right upper forehead. She had multiple purple lesions on her right neck. Dr. McColgan reviewed CAT scans taken of the [baby's] head, spine and abdomen. The CAT scan of the [baby's] head showed widespread swelling and edema of the brain, a subdural hemorrhage on the right parietal portion and the space between the two hemispheres of the brain and an overlying blood collection over the scalp. There was a skull fracture of the right parietal head. An ophthalmology examination showed bleeding in multiple layers of the retina of the eyes. X-Rays of the [baby's] bones showed fractures in both legs of the femur (the longest bone in the upper leg) and of the upper end of the tibias, (the bones of the lower leg). Dr. McColgan testified further that the fractures to the [baby's] leg bones indicated that a significant amount of force was used and such fractures are commonly seen in shaking injuries.

Dr. McColgan testified that the allegation that the [baby's] injuries were caused by a fall from a playpen was inconsistent with her injuries. She opined that falls of three (3) to six (6) feet rarely, if ever, lead to life threatening injuries as were seen in the [baby's] case. She concluded that to a reasonable degree of medical certainty that the injuries were a result of inflicted trauma.

The defense called Dr. Supriya Kuruvilla, the Director of Autopsy and Forensic Services of the Reading Hospital and Medical Center in Reading, Pennsylvania, as an expert in forensic pathology and pediatric pathology. She testified

that she reviewed police reports, medical records, witness statements and pathology slides in connection with the death of [baby]. She agreed with certain aspects and disagreed with other aspects of Dr. Osbourne's assessment. She agreed with the cause of death, which was craniocerebral trauma but disagreed that shaking the [baby] was part of the causation of the injuries. She opined that the injuries were from a fall that involved at least two (2) points of impact to the head, the rocker and the hardwood floor. She opined that the [baby] sustained a lateral flexion of the neck as a result of a fall, thereby causing the injuries. She, therefore agreed with Dr. Osbourne's cause of death, but would have called the manner of death accidental or undetermined.

(Trial Court Opinion, filed November 19, 2013, at 2-7) (internal citations to record omitted).

Police arrested Appellant on December 29, 2009, and charged him with third-degree murder, involuntary manslaughter, and EWOC. On February 13, 2012, a jury convicted Appellant of third-degree murder and EWOC. On June 5, 2012, the court sentenced Appellant to twelve (12) to twenty-four (24) years' imprisonment and ten (10) years' probation. Appellant filed a post-sentence motion on June 15, 2012, which claimed the verdict was against the weight of the evidence. On November 12, 2012, Appellant's post-sentence motion was denied by operation of law. Appellant timely filed a notice of appeal on December 7, 2012. On June 6, 2013, the court ordered Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Appellant timely filed his Rule 1925(b) statement on October 4, 2013, after the court granted Appellant four extensions of time to file his Rule 1925(b) statement.

Appellant raises the following issue for our review:

> WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN
> FAILING TO GRANT [APPELLANT'S] POST-SENTENCE
> MOTION FOR A NEW TRIAL ON THE GROUNDS THAT THE
> VERDICTS WERE AGAINST THE WEIGHT OF THE EVIDENCE
> AS TO THE CHARGES OF MURDER IN THE THIRD-DEGREE
> AND ENDANGERING THE WELFARE OF A CHILD?

(Appellant's Brief at 2).

Our well-settled standard of review regarding the weight of the evidence is:

> The weight of the evidence is exclusively for the
> finder of fact who is free to believe all, part, or none
> of the evidence and to determine the credibility of
> the witnesses. An appellate court cannot substitute
> its judgment for that of the finder of fact. Thus, we
> may only reverse the…verdict if it is so contrary to
> the evidence as to shock one's sense of justice.
>
> ***Commonwealth v. Small***, 559 Pa. 423, [435,] 741 A.2d
> 666, 672-73 (1999). Moreover, where the trial court has
> ruled on the weight claim below, an appellate court's role
> is not to consider the underlying question of whether the
> verdict is against the weight of the evidence. Rather,
> appellate review is limited to whether the trial court
> palpably abused its discretion in ruling on the weight
> claim.

***Commonwealth v. Champney***, 574 Pa. 435, 444, 832 A.2d 403, 408 (2003), *cert. denied*, 542 U.S. 939, 124 S.Ct. 2906, 159 L.Ed.2d 816 (2004) (most internal citations omitted). "The trial judge may not grant relief based merely on some conflict in testimony or because the judge would reach a different conclusion on the same facts." ***Commonwealth v. Sanchez***, 614 Pa. 1, 27, 36 A.3d 24, 39 (2011).

Appellant argues his expert's testimony substantially contradicted the Commonwealth's expert evidence that the baby's death was a homicide. Appellant asserts his expert's medical testimony concluded the baby's death was an "accident or undetermined." Appellant contends the trial court ignored this testimony when it denied Appellant's post-sentence motion for a new trial. Appellant concludes this Court should vacate his judgment of sentence and grant him a new trial because the verdict was against the weight of the evidence. We disagree.

Instantly, the trial court stated:

> A trial court's denial of a motion for a new trial based on a claim that the verdict was against the weight of the evidence will not be disturbed unless the trial court abused its discretion in denying such a motion. A new trial can only be granted on a claim that the verdict was against the weight of the evidence in the extraordinary situation where the jury's verdict is so contrary to the evidence that it shocks one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail.

> Applying the standard to this case, the trial court did not abuse its discretion in denying [Appellant's] motion for a new trial as the jury's verdict did not shock the court's sense of justice.

> Therefore, this claim is without merit.

(Trial Court Opinion at 11) (internal citation omitted). We agree. Here, the jury as finder of fact was free to believe all, part or none of the expert medical testimony presented by either party and to determine the appropriate weight accorded each medical expert's opinion. *See Small,*

*supra*.  The jury credited the Commonwealth's expert testimony and version of events which led to the baby's death.  The mere fact that the parties' experts disagreed on the cause of death is not alone grounds for a new trial. *See Sanchez, supra*.  The Commonwealth's evidence fully supported the jury's verdict, regardless of what Appellant's medical expert opined; thus, the verdict was not so contrary as to shock the trial court's sense of justice. *See Champney,supra*.  Therefore, the trial court did not abuse its discretion when it denied Appellant's post-sentence motion for a new trial based on a challenge to the weight of the evidence.  *See id.*  Accordingly, we affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>10/31/2014</u>