J-S36020-20

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| MATTHEW JAMES RAMSAY | : | |
| | : | |
| Appellant | : | No. 1857 WDA 2019 |

Appeal from the Judgment of Sentence Entered June 19, 2019
In the Court of Common Pleas of Westmoreland County
Criminal Division at No(s):  CP-65-CR-0001302-2017

BEFORE:   OLSON, J., KING, J., and PELLEGRINI, J.[*]

MEMORANDUM BY KING, J.:                    FILED SEPTEMBER 18, 2020

Appellant, Matthew James Ramsay, appeals from the judgment of sentence entered in the Westmoreland County Court of Common Pleas, following his jury trial convictions for third-degree murder, driving under the influence of a controlled substance ("DUI"), homicide by vehicle, and accidents involving death or personal injury, and his bench trial conviction for careless driving.[1]  We affirm.

The relevant facts and procedural history of this case are as follows:

> The instant case arises out of a fatal hit and run crash on December 24, 2016, on Ruffsdale Alverton Road in East Huntingdon Township, Westmoreland County.  [Victim] died as a result of the injuries he sustained from the vehicle

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. § 2502(c), 75 Pa.C.S.A. §§ 3802(d)(1)(i), 3732(a), 3742(a), and 3714(a), respectively.

crash. The evidence presented at trial established that on the date of the incident, [Appellant] was driving his vehicle in the southbound lane of Ruffsdale Alverton Road. At this time, [Victim] was jogging on the berm of the northbound lane of Ruffsdale Alverton Road facing oncoming traffic. While driving in the southbound lane, [Appellant]'s vehicle crossed over the roadway striking and killing [Victim] from behind. [Appellant] left prior to anyone arriving on scene.

The Commonwealth presented the testimony of multiple witnesses at trial. [Victim's wife] testified that on the date of the incident, [Victim] decided to go for a walk and headed in the direction of Ruffsdale Alverton Road. [Victim] was accompanied by one of his dogs at that time. [Victim's wife] testified that her husband had a habit of being extra cautious, and he always walked against traffic. Justin Alan Kuhn, who resided at 816 Ruffsdale Alverton Road, testified that on the date of the incident, he observed a familiar man jogging with his dog during the afternoon hours. Mr. Kuhn testified that he observed the man cross over to the opposite side of the road facing traffic; and approximately five minutes later, he observed the same dog circling up the road and saw what appeared to be the gentleman lying on the ground.

Michael Bisher testified that on the afternoon of Christmas Eve in 2016, he was a passenger in a vehicle driven by Stephen Babick. Mr. Bisher stated that while driving southbound down Ruffsdale Alverton Road, he observed a dog running loose and then observed a person lying on the ground. Mr. Bisher indicated that when he and Mr. Babick first arrived, no one else was present at the scene until the paramedic arrived. David Lovis, who is employed as a paramedic supervisor with Mutual Aid Ambulance Service, testified that on the afternoon of December 24, 2016, he responded to the vehicle pedestrian accident and observed an unresponsive victim laying up in the weeds, and a dog running around.

Pennsylvania State Police Trooper Kevin Wheelden was the lead investigator on this case. He testified that on December 24, 2016, he was dispatched to the scene of the crash on Ruffsdale Alverton Road. Trooper Wheelden indicated that there were no adverse weather conditions,

and the roadway was clear at that time. During trial, Corporal Bradley Poole, who is employed as a Patrol Supervisor with the Pennsylvania State Police, testified as an expert witness in the area of accident reconstruction. Corporal Poole testified that he arrived on scene at 3:48 p.m. on December 24, 2016. Corporal Poole stated that there were no observed defects on the roadway that would have caused the collision at that time, and there were no environmental conditions with [Appellant]'s 1995 Saturn SC vehicle or the roadway that would account for [Appellant]'s vehicle being driven outside of its southbound lane into the northbound lane. Additionally, Corporal Poole testified that there were no brake marks, skid marks, or yaw marks on the roadway caused by [Appellant]'s vehicle.

Christopher Lee Johnson testified that in December of 2016, he resided in the New Stanton Manor Apartments. Mr. Johnson stated that [Appellant] also lived in the same building, and [Appellant]'s apartment was located two floors below his. Mr. Johnson testified that he saw [Appellant] on a regular basis, and he knew [Appellant]'s car to be a red Saturn. On December 24, 2016, Mr. Johnson stated he received a text message from [Appellant] asking him for a ride. Mr. Johnson indicated that [Appellant] also sent him two pictures of his vehicle with the text, "Sum 1 walked out in front of me." Anthony Williams also had occasion to stay at the New Stanton Manor Apartments. Mr. Williams testified that he had previously dated [Appellant]'s current girlfriend, Lindsay Myers, and he sometimes stayed with them at their apartment in New Stanton. Mr. Williams stated that on the afternoon of December 24, 2016, he and [Appellant] planned to go to Walmart in Mount Pleasant. Mr. Williams testified that he was a passenger in [Appellant]'s vehicle. During the trip, Mr. Williams stated that he was emptying out the contents of his pockets on the dashboard and looking down at his phone when he heard a loud thump and observed the windshield cracked on the driver's side. Mr. Williams testified that he believed [Appellant] swerved left to right to avoid hitting potholes; however, he did not witness the crash. Mr. Williams stated that [Appellant] then proceeded to his dad's house, and then the three of them went to Walmart in [Appellant]'s father's vehicle. Mr. Williams described [Appellant] as appearing "tired" and "stressed out" on this day.

- 3 -

Retired Trooper Richard Stepinsky, Jr. testified that following the crash, he was dispatched to the site to photograph the crime scene and collect evidence. Mr. Stepinsky testified that he and Corporal Isoldi also responded down the road to a trailer park at which time they found a vehicle parked alongside the trailer. The vehicle was described as partially covered with a tarp, and there was blood on the vehicle. Trooper Wheelden testified that [Appellant] was identified as the driver of the vehicle. As a result of the investigation, [Appellant] was subsequently interviewed by Troopers Wheelden, Zalich, and Adams at the State Police Barracks in Greensburg. The interview began at 11:00 p.m. on December 24, 2016. During the interview, Trooper Wheelden stated that [Appellant] appeared "very unkempt," and he "seemed to be slow and sluggish." Additionally, Trooper Wheelden described [Appellant]'s hair as being "long" and "greasy," and he described his clothing as being "dirty." After being appraised of his Miranda[2] rights, [Appellant] consented to give a recorded statement to the troopers. Said statement was introduced at trial as Commonwealth's Exhibit 25, and a transcript of the audio was introduced as Commonwealth's Exhibit 24.

According to the transcript from the police interview, [Appellant] indicated that he was driving his vehicle on Ruffsdale Alverton Road on that day, and at approximately 2:30, he hit something which caused his windshield to crack. After looking around and not seeing anything, [Appellant] indicated he left the scene and shortly returned; however, he was unable to find anything or anyone.

During the police interview, the following dialogue occurred between Trooper Zalich and [Appellant]:

Trooper Zalich: [Appellant] I think you saw what you hit.

[Appellant]: No, honestly I didn't. I really didn't see.

_____

[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

- 4 -

Trooper Zalich: In broad day light you didn't see what you hit?

[Appellant]: No, I really didn't see if, what I hit.

Trooper Zalich: Do you realize you were driving all over the road too?

[Appellant]: I kinda...

Trooper Zalich: Swerving

[Appellant]: ...just do this sometimes (unintelligible)

Trooper Zalich: Okay, lanes are made for a reason

[Appellant]: I know

Trooper Zalich: [Whether] it's a lined road or it's an unlined road

[Appellant]: I know

Trooper Zalich: [Whether] there is traffic or no traffic

[Appellant]: I know, I'm sorry, I just, sometimes

Trooper Zalich: So you're saying yesterday you consumed your Methadone in the morning at roughly 9 am

[Appellant]: Yes

When asked what [Appellant] was doing when he responded to those questions concerning the nature of his driving, Trooper Wheelden testified that [Appellant] acted as if he was grabbing ahold of the steering wheel, and he was making a motion when he was describing how he sometimes just swerves all over the roadway.

Trooper Wheelden stated that [Appellant]'s blood was collected on December 25, 2016 at 5:06 a.m., and the samples were sent to NMS Laboratories for analysis. The results of the analysis indicated the presence of 87

nanograms per milliliter of Alprazolam (Xanax), 170 nanograms per milliliter of Delta-9 Carboxy THC and Delta-9 THC (marijuana), and 280 nanograms per milliliter of methadone in [Appellant]'s blood. As [Appellant] did not acknowledge in the interview to taking any illicit substances, other than marijuana after the crash and methadone before the crash, and because of the fifteen hour delay in testing [Appellant]'s blood, the Commonwealth acknowledged that the extrapolation back to [Appellant]'s actual time of operation could not be done. Forensic Pathologist, Dr. Cyril H. Wecht testified that an autopsy of [Victim] was performed, and it was determined that [Victim] died due to blunt force trauma to his head and trunk. Dr. Wecht stated that a toxicology test was also performed on [Victim], and the results were negative. Additionally, Dr. Wecht testified to the impact that benzodiazepines, marijuana, and methadone can individually and in combination have on the mental and physical faculties of a body.

Lastly, Mary Beth Grundler, who is employed as a facility director at the methadone facility, RHJ Medical Center testified that [Appellant] was a client at the methadone facility starting in January of 2014. As part of [Appellant]'s admission to the facility, Ms. Grundler testified that [Appellant] reviewed and signed numerous forms. Specifically, Ms. Grundler testified that upon entry at the facility, [Appellant] signed a "Consent to Treatment" form, a "Medication Driving Agreement" form, in which [Appellant] denied taking any prescription and/or non-prescribed drugs, alcohol, or marijuana; a "Policy and Procedures Statement" form, in which patients are directed to cease using illicit drugs while using methadone; an "Information Disclosure" form; an "Additional Policies and Procedures for Clients with Benzodiazepines Prescriptions"; and a "Client Handbook." Ms. Grundler indicated that all clients are informed that if they use a benzodiazepine in conjunction with methadone, it can make them more lethargic and create more intensity of either drug. Ms. Grundler testified that when [Appellant] first was admitted to the methadone clinic, his urine tested positive for benzodiazepine, THC, and methadone. Despite any knowledge that [Appellant] had ever been prescribed a benzodiazepine, Ms. Grundler confirmed that [Appellant] continued to test positive for benzodiazepines in addition to his methadone through May of 2016. As a result of the

positive tests, Ms. Grundler testified that [Appellant] was counseled and directed to abstain from abusing benzodiazepines. Ms. Grundler stated that on December 22, 2016, [Appellant] provided a urine sample in which no benzodiazepines were detected.

The Defense presented one witness at trial. Lindsay Jean Ramsay, who is [Appellant]'s wife, testified that on the morning of December 24, 2016, she and [Appellant] woke up and went to the methadone clinic together. Mrs. Ramsay testified that she observed [Appellant] take his 55 milligram dosage of methadone around 9:00 a.m. Mrs. Ramsay stated that prior to going to the methadone clinic, she did not see [Appellant] smoke any marijuana or take any other pills or illicit drugs. Mrs. Ramsay testified that [Appellant] remained at the apartment with her until approximately 1:30 p.m. [Appellant] elected not to testify at trial.

(Trial Court Opinion, dated November 15, 2019, at 1-8) (internal citations omitted).

At the conclusion of trial on March 15, 2019, the jury convicted Appellant of third-degree murder, DUI, homicide by vehicle, and accidents involving death or personal injury. The court also found Appellant guilty of the summary offense of careless driving. On June 10, 2019, the court sentenced Appellant to an aggregate term of 15 to 30 years' imprisonment.[3] Appellant timely filed post-sentence motions on June 20, 2019. Following a hearing on August 13, 2019, the court entered an opinion and order on November 15, 2019, denying Appellant's motion. Appellant timely filed a notice of appeal on Monday, December 16, 2019. On December 31, 2019, the court ordered Appellant to

_____

[3] The court entered an amended sentencing order on June 19, 2019, confirming that Appellant had been found guilty of careless driving.

- 7 -

file a concise statement of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(b); Appellant complied on January 21, 2020.

On appeal, Appellant raises two issues:

Whether the trial court erred by denying Appellant's post-sentence motion for a judgment of acquittal for the reason that there was insufficient evidence to support the jury verdict of guilty for the charge of murder of the third degree at count 1 of the information?

Whether the trial court erred by denying Appellant's post-sentence motion for a new trial for the reason that the jury verdict of guilty for the charge of murder of the third degree at count 1 of the information was against the weight of the evidence?

(Appellant's Brief at 6).

In his issues combined, Appellant argues the Commonwealth failed to present sufficient evidence at trial to prove Appellant committed third-degree murder. Specifically, Appellant alleges the Commonwealth failed to establish that Appellant acted with malice. Appellant concedes the evidence the Commonwealth presented may have been sufficient to establish that he acted negligently. For similar reasons, Appellant asserts the jury's verdict for third-degree murder was against the weight of the evidence. Appellant concludes he is entitled to relief on his challenges to the sufficiency and/or weight of the evidence, and that he is entitled to judgment of acquittal or a new trial. We disagree.

When examining a challenge to the sufficiency of evidence, our standard of review is as follows:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the [trier] of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

Commonwealth v. Hansley, 24 A.3d 410, 416 (Pa.Super. 2011), appeal denied, 613 Pa. 642, 32 A.3d 1275 (2011) (quoting Commonwealth v. Jones, 874 A.2d 108, 120-21 (Pa.Super. 2005)). Additionally:

> The weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. An appellate court cannot substitute its judgment for that of the finder of fact. Thus, we may only reverse the…verdict if it is so contrary to the evidence as to shock one's sense of justice.

> Commonwealth v. Small, 559 Pa. 423, [435,] 741 A.2d 666, 672-73 (1999). Moreover, where the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim.

- 9 -

Commonwealth v. Champney, 574 Pa. 435, 444, 832 A.2d 403, 408 (2003), cert. denied, 542 U.S. 939, 124 S.Ct. 2906, 159 L.Ed.2d 816 (2004) (most internal citations omitted).

The Crimes Code defines murder as follows:

§ 2502. Murder

(a) Murder of the first degree.—A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing.

(b) Murder of the second degree.—A criminal homicide constitutes murder of the second degree when it is committed while defendant was engaged as a principal or an accomplice in the perpetration of a felony.

(c) Murder of the third degree.—All other kinds of murder shall be murder of the third degree. Murder of the third degree is a felony of the first degree.

*     *     *

18 Pa.C.S.A. § 2502(a)-(c). "Murder in the third degree is an unlawful killing with malice but without the specific intent to kill." Commonwealth v. Dunphy, 20 A.3d 1215, 1219 (Pa.Super. 2011). Malice is defined as:

[A] wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured.... [M]alice may be found where the defendant consciously disregarded an unjustified and extremely high risk that his actions might cause serious bodily injury.

Commonwealth v. DiStefano, 782 A.2d 574, 582 (Pa.Super. 2001), appeal denied, 569 Pa. 716, 806 A.2d 858 (2002). "Malice may be inferred by considering the totality of the circumstances." Dunphy, supra.

Instantly, the Commonwealth presented at trial, inter alia: (1) testimony from Trooper Wheelden and Corporal Poole that there were no defects in the roadway or any environmental conditions that would explain Appellant's failure to maintain his lane of travel; (2) testimony from Mr. Johnson that Appellant texted him a picture of Appellant's damaged vehicle with the message, "Sum 1 walked out in front of me;" (3) testimony from Mr. Williams that Appellant appeared "tired" and "stressed out" on the date of the incident, and that Appellant left the scene after the crash and proceeded with his plan to visit Walmart; (4) Mr. Stepinsky's testimony that Appellant's vehicle was found with a cracked windshield covered by a tarp and with blood on the driver's side of the car; (5) Appellant's police interview recording, in which Appellant admitted that he sometimes swerves all over the roadway while driving; (6) testimony from Trooper Wheelden that Appellant appeared "slow and sluggish" on the date of the incident; (7) testimony that fifteen hours after the crash, Appellant's blood was taken and Appellant tested positive for Xanax, marijuana, and methadone; (8) testimony from Dr. Wecht regarding the effects that Xanax, marijuana, and methadone can have, both individually and in combination with each other; and (9) testimony from Ms. Grundler that Appellant had been instructed not to take any other drugs while in recovery, but Appellant continued to take the drugs despite repeated warnings about the side effects (lethargy, etc.) of mixing drugs with methadone.

In its opinion denying Appellant's post-sentence motions, the trial court concluded that the evidence presented supported a finding of malice, stating:

> Based upon [Appellant]'s disregard for the repeated warnings of the dangerous effects of mixing Xanax with methadone, the presence of Xanax, marijuana, and methadone in his blood following the accident, his admission regarding his reckless manner of driving, the absence of any testimony that there were any environmental or climatic conditions that would explain [Appellant]'s failure to maintain his lane of travel, [Appellant]'s flight after hitting [Victim], and [Appellant]'s conduct following the crash demonstrate that [Appellant] completely disregarded an unjustified and extremely high risk that his actions would cause death or serious bodily injury to support a conviction of third degree murder.

(Trial Court Opinion at 12). Viewed in the light most favorable to the Commonwealth as verdict-winner, we agree with the court's analysis that the evidence was sufficient to convict Appellant of third-degree murder. See 18 Pa.C.S.A. § 2502(c); Hansley, supra. For similar reasons, we will also not disturb the trial court's denial of Appellant's weight of the evidence challenge. See Champney, supra. Accordingly, we affirm.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/18/2020