J-S14012-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: N.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: N.S. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 991 MDA 2023 |

Appeal from the Dispositional Order Entered May 31, 2023
In the Court of Common Pleas of Lancaster County Juvenile Division at
No(s): CP-36-JV-0000563-2022

BEFORE: LAZARUS, P.J., PANELLA, P.J.E., and MURRAY, J.

MEMORANDUM BY LAZARUS, P.J.:     **FILED: MAY 22, 2024**

N.S. appeals from the dispositional order, entered in the Court of Common Pleas of Lancaster County, after he was adjudicated delinquent for criminal attempt to commit indecent assault[1] and harassment.[2]  After our careful review, we affirm.

The Honorable Christopher A. Hackman set forth the facts of this case as follows:

> At the time of the disposition[al] hearing, [N.S.] was 15 years old. On or about August 26, 2022, the victim and [N.S.] were at a football game at Lampeter Strasburg High School.  According to the victim, she was behind the bleachers when [N.S.] approached her.  The victim testified that [N.S.] came up to her, grabbed her arm[,] and tried to kiss her.  She pushed him away and asked him what he was doing.  [N.S.] did not answer and came up to her

---

[1] 18 Pa.C.S.A. § 3126(a)(1) (indecent assault); *id.* at § 901 (criminal attempt).

[2] *Id.* at § 2709(a)(1).

again and tried to lift her shirt up and put his hands in her shirt. Once again, the victim pushed him, this time with more force, and then ran away. Shortly after the incident, the victim confided in a friend, O.M., about what had happened. The victim testified that there was a rumor going around that O.M. had raped her but that it was untrue, and that [N.S.] was the one who attempted to assault her. The victim testified that she did not hear about the rumor until after the game was over.

O.M. testified that he and the victim were hanging out for the first half of the football game. He testified that [the victim] was excited and having fun hanging out with her friends. When he saw her next, towards the end of the third quarter, she was crying and appeared scared and upset. He testified that the victim told him that she had been touched inappropriately without her permission. The victim told O.M. that [N.S.] was the person that touched her.

Officer [Alexander] Daminger [of the Lampeter Township Police Department] testified that he interviewed the victim at her house regarding the incident. Officer Daminger, as a part of his investigation, also interviewed O.M. and [N.S.] He testified that he contacted the school asking for access to the surveillance cameras. He viewed the surveillance footage but testified that there were many dead zones, and the footage was dark. As a result of his investigation, [Officer Daminger] decided to file charges again [N.S.]

Juvenile Court Opinion, 9/6/23, at 1-2 (citations to record and unnecessary capitalization omitted).

On March 30, 2023, Judge Hackman held an adjudicatory hearing, after which he entered an order finding that N.S. committed the above-mentioned offenses; he deferred a determination of delinquency. A dispositional hearing was held before the Honorable David R. Workman, who, on May 31, 2023, entered a dispositional order adjudicating N.S. delinquent and placing him on probation until further order of court. On June 12, 2023, N.S. filed a post-dispositional motion raising a challenge to the weight of the evidence, which

was denied. N.S. filed a timely notice of appeal, followed by a court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. He raises the following claims for our review:

1. Did the court err in allowing [] O.M. to testify to what the victim said to him after the alleged incident took place where this testimony was hearsay and not a prior consistent statement?

2. Did the court abuse its discretion in finding that the guilty verdict[s] for the charges of attempted indecent assault and harassment [were] not against the weight of the evidence where the testimony was so unreliable, inconsistent[,] and contradictory that the verdict was based purely on conjecture?

Brief of Appellant, at 6 (unnecessary capitalization omitted).

N.S.'s first claim challenges the juvenile court's decision to admit the testimony of O.M. regarding the victim's statements to him following the incident. The trial court's decision to admit evidence is subject to review for an abuse of discretion. *Commonwealth v. Hairston*, 84 A.3d 657, 664 (Pa. 2014). "An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." *Id.* at 664-65 (citation omitted).

Prior to addressing N.S.'s claim, it is necessary to provide some context for the testimony in question. On direct examination, the Commonwealth questioned the victim regarding her actions following the incident:

Q. Okay. And after you pushed away from [N.S.], you said you then took off and ran?

A. I took off and ran.

Q. Okay. Where did you run to?

A. I ran over to where the snack bar is at the main entrance and the brick walls that are there at the entrance[.] I ran over there and I kind of just sat there.

Q. Okay. And what were you doing while you sat there?

A. I was just, like, trying to, like, think what was going on. I was just trying to, like, gather my thoughts like that just happened, [] like what would've happened if I didn't stop him. Like, I was just thinking of all these things.

Q. Did anyone come up to you while you were sitting over there?

A. Eventually, [O.M.] noticed that I was scared. He could tell I was—there was something bothering me. So[,] he had eventually came up to me and asked me what was wrong.

Q. And did you tell [O.M.] what happened?

A. At first[,] I didn't want to because I didn't know what he would have done if I had told him what had happened. And then he kept forcing the answer out of me. He kept saying, like, what's wrong, you need to tell me, I know you're not okay. He said stuff like that, and then eventually I just—I had to tell him.

Q. Okay. And what did [O.M.] do after you told him what happened?

A. He was [] just reassuring me that everything was going to be okay and that he was going to take care of the situation. And he had taken me over to, like, along the fence and we were just kind of sitting there, and he kind of told his friends about it. And his friends [] then went and looked for [N.S.]

Q. Okay. And are you aware of a rumor that got started sometime after this football game?

A. Yes, I am.

Q. Okay. And what was that rumor?

A. The rumor was that [O.M.] had raped somebody[3] on that night.

Q. Did [O.M.] do anything inappropriate towards you—

A. No.

Q. –that night?

A. Not at all. All he was worried about was making sure I was okay.

Q. Did [O.M.] do anything inappropriate to you prior to or after that night?

A. No.

Q. And you—have you ever communicated with [N.S.] via text message or social media?

A. After or [] before?

Q. After the football game.

A. Yes, I did. I had contacted him later in the night.

Q. Okay. And when you contacted him, do you recall how you contacted him?

A. I can't really remember what I said, but I think I remember asking him why he did what he did and, like, I kind of just wanted an answer from him, and he didn't [] respond.

Q. Okay. Did you send him any other messages after that night?

A. No.

Q. Did you ever send him a message asking him to lie about what happened that night?

A. I didn't.

Q. Did you ever ask him to cover for someone else?

A. No.

---

[3] Subsequent testimony clarifies that the person O.M. was alleged to have raped was, in fact, the victim herself.

Q. Did you ask him about whether—about coming clean about what happened that night?

A. I had [] said something similar to that. I wanted him to tell people that it was him, because I didn't want this whole thing to blow up. So[,] I just wanted him to tell everybody what happened.

N.T. Adjudicatory Hearing, 3/30/23, at 13-15.

Subsequently, during defense counsel's vigorous cross-examination of the victim, the following exchange occurred:

Q. [W]hat did you do after you ran toward the concession stand?

A. [] I was against—I had ran over, and I sat against the brick wall where the entrance is.

. . .

Q. How long before [O.M.] came up?

A. I think it was about maybe like two minutes—two/three minutes.

Q. And then he came up and gave you a hug?

A. Yes. After I had—after I had told him—well, not after I told him, after he had asked me and I said I didn't want to tell him, he had gave me a hug to like reassure me that everything was fine and he—that's when I told him.

Q. And as result of that[,] odd rumors started flying around?

A. Yes. People thought that [O.M.] did something to a girl.

Q. That he had raped you?

A. Yes.

Q. You would agree your parents are pretty strict?

A. I would agree with that, yes.

Q. And you're not allowed to date?

A. Not at my age, no.

. . .

Q. So[,] you certainly wouldn't be allowed to date [O.M.]?

A. No.

Q. But, again, everyone saw you hugging him at the game and that started rumors?

A. [Yes].

. . .

Q. And you testified a few minutes ago that you didn't want it to blow up?

A. I didn't want it to blow up, no.

Q. All right. So[,] as a result of that, you were afraid of getting into trouble with your parents?

A. Yes. I didn't want him to say anything to anyone because I knew my parents would get involved and then I was scared that I was going to get in trouble for the whole thing—just letting it happen and then I thought, like, I was—I just didn't want them to get involved.

Q. So[,] you needed someone else to blame; right?

A. Can you be more specific?

Q. I said, so you needed someone else to blame?

A. For what?

Q. There was a rumor going around about [O.M.] raping you, so you needed someone else to blame?

A. [] I'm not sure. I didn't hear about the whole situation until afterwards. His friend had . . . asked me about what happened that night because they were saying that [O.M.] had did something to me when he didn't, and I was telling them that it was [N.S.] that did something and not [O.M.]

Q. So, yeah, the person to blame became [N.S.]?

A. Um-hum.

Q. Correct?

A. Yes.

. . .

Q. You have social media accounts, don't you?

A. I do.

Q. Like Instagram and Snapchat?

A. Yes.

Q. Is your Instagram address [xxx]?

A. [] I recently changed it, so not anymore.

Q. But it would have been that at this time?

A. Yes.

. . .

Q. Oh, first, [] so if something was posted on your Instagram account that would be you posting it?

A. Yes.

. . .

Q. All right. [] I'm handing you what has been marked as Exhibits 8, 9 and 10. Do you recognize that? Would that be your Snapchat account?

A. Am I allowed to flip to the next page?

Q. Sure.

A. Okay. That does look like me.

Q. And you would agree that you sent those Snapchats?

A. I don't remember saying that.

Q. And you would agree that you sent those Snapchats to [N.S.]?

A. Not [] these.

Q. And Snapchat is the social media where they disappear [] after they're opened; right?

A. Yes.

Q. Unless someone screenshots them?

A. Yes.

Q. So that's not you saying, ["]I just really need you to say you did but whatever.["] That's not you?

A. I don't remember saying that.

Q. You don't?

A. No.

Q. But this is your Snapchat account?

A. [] I don't know.

Q. And those were sent to [N.S.]?

A. It looks like it was sent to [N.S.], but that doesn't look—that doesn't seem like it was me.

Q. And then [N.S.] respon[ds], ["]I did not do that, and I'm not going to say I did that even if [O.M.] is involved or whatever, it has nothing to do with me.["] You would agree that's what Exhibit 8 says; right?

A. What? Yes, I see that.

Q. And then on Exhibit 9, [N.S.] responds, ["]I'm not getting involved with this.["] And then you respond—or someone from your account—["]okay, like I said, I don't care[."]

. . .

A. I don't say stuff like that.

. . .

Q. So[,] by sending these Snapchats, you were obviously trying to get [N.S.] to take the fall for this?

A. That's what it looks like, but I didn't do this.

*Id.* at 30-33, 34, 35, 38-39, 40.

Following the defense's cross-examination of the victim, the Commonwealth called O.M. to the stand. O.M. stated that he knew the victim, but did not know N.S. *Id.* at 55. O.M. testified that he saw the victim during

- 9 -

the first half of the game and that she was "excited" and "having fun." *Id.* at 56. Subsequently, toward the end of the third quarter, O.M. saw the victim again and she was crying. *Id.* at 57. The following exchange occurred during the Commonwealth's direct examination of O.M.:

> Q. Okay. And what did you do upon seeing her?
>
> A. I asked her if everything was okay and she came—and she ran up to me and gave me, like, a hug and she was, like, scared and, like, upset.
>
> Q. And what did she say to you?
>
> A. She was like—
>
> ATTORNEY COOPER: Objection, Your Honor. Hearsay.
>
> THE COURT: This is for prior consistency.
>
> ATTORNEY LAPP: It's more for the effect of the listener and—
>
> THE COURT: It sounds like a prior consistent statement that truly is done after your impeachment. I'll allow it.
>
> BY ATTORNEY LAPP:
>
> Q. What did [the victim] say to you?
>
> A. So[,] she told me that she was, like—she was, like, just off with some of her friends and then she came up to me crying and said that she was touched very inappropriately, unwillingly—like unallowing.
>
> Q. Did she say who touched her?
>
> A. She wouldn't tell me the name at the time, but then later she told me that his name was [N.S.].

*Id.* at 57-58.

At the time of the adjudicatory hearing, the court admitted O.M.'s above testimony as a prior consistent statement, admissible to rebut the defense's

- 10 -

challenge to the victim's credibility on cross-examination. Specifically, defense counsel introduced evidence from the victim's social media accounts to suggest that the victim tried to get N.S. to take the blame for O.M., as a rumor had subsequently circulated that O.M. had raped her at the football game. In its subsequent Rule 1925(a) opinion, the court, "upon reflection," concluded that O.M.'s testimony was also admissible as an excited utterance.

On appeal, N.S. argues that O.M.'s testimony was not admissible under Pa.R.E. 803.1(2), which provides for the admissibility of "[a] prior statement by a declarant-witness identifying a person or thing, made after perceiving the person or thing, provided that the declarant-witness testifies to the making of the prior statement." Pa.R.E. 803.1(2). N.S. argues that this rule is inapplicable here, as the victim did not testify to the making of the prior statement and only stated that "eventually I just—I had to tell [O.M.]" Brief of Appellant, at 13, quoting N.T. Adjudicatory Hearing, 3/30/23, at 13. N.S. argues that "[t]he victim did not testify regarding any other details. She did not testify to making any identification to O.M. She did not testify to what she 'had to tell him.' Without the victim testifying to the making of the prior statement, Rule 803.1(2) is inapplicable." Brief of Appellant, at 13. N.S. is entitled to no relief.

We agree with the juvenile court that O.M.'s testimony was admissible as a prior consistent statement. Pennsylvania Rule of Evidence 613(c) permits the admission of evidence of a prior consistent statement for rehabilitation purposes if the opposing party is given an opportunity to cross-examine the

witness about the statement, the statement is offered to rebut an express or implied charge of fabrication, bias, improper influence or motive, or faulty memory, and the statement was made before the fabrication, bias, etc.[4] Pa.R.E. 613(c)(1); Pa.R.E. 613 Comment.

> [P]rior consistent statements may be admitted to corroborate or rehabilitate the testimony of a witness who has been impeached, expressly or impliedly, as having a faulty memory, or as having been induced to fabricate the testimony by improper motive or influence. Admission of prior consistent statements on such grounds is a matter left to the sound discretion of the trial court, to be decided in light of the character and degree of impeachment. It is not necessary that the impeachment be direct; it may be implied, inferred, or insinuated either by cross-examination, presentation of conflicting evidence, or a combination of the two.

*Commonwealth v. Baker*, 963 A.2d 495, 504 (Pa. Super. 2008).

Here, the defense's theory of the case was that the victim contacted N.S. through social media after rumors began spreading that O.M. had assaulted the victim at the football game, in an attempt to convince N.S. to take the blame for what O.M. was rumored to have done. Defense counsel questioned the victim regarding a Snapchat message she sent to N.S. saying "I just really need you to say you did but whatever." N.T. Adjudicatory Hearing, 3/30/23, at 39. Counsel characterized the purpose behind the message as the victim "obviously trying to get [N.S.] to take the fall for this." *Id.* at 40. In light of this cross-examination suggesting that the victim had a motive to fabricate her testimony that N.S. assaulted her, O.M.'s testimony was admissible to rehabilitate the victim by corroborating her testimony

---

[4] N.S. does not address the applicability of Rule 613 in his brief.

regarding the actions of N.S. The alleged motive to fabricate—the rumor that O.M. had raped the victim at the game—did not arise until after the victim made her statement to O.M. toward the end of the third quarter of the game. *See id.* at 14 (Commonwealth questioning victim as follows: "Q: Okay. And are you aware of a rumor that got started **sometime after this football game?** A. Yes, I am. Q: Okay. And what was that rumor? A: The rumor was that . . . [O.M.] had raped somebody on that night."); *id.* at 49 (victim testifying she heard rumor regarding O.M. "later in the day or the next day"). Accordingly, the juvenile court did not abuse its discretion in admitting O.M.'s testimony as a prior consistent statement by the victim.

Finally, N.S. asserts that the court's findings that he committed attempted indecent assault and harassment were against the weight of the evidence. N.S. cites alleged inconsistencies in the victim's testimony, as well as the fact that she did not report N.S. to her parents or security staff present at the game. He also highlights the fact that, during her interview with Officer Daminger, the victim did not mention that N.S. had tried to reach up her shirt, telling him only that N.S. had pulled her shirt up. Finally, N.S. argues the victim accused him because she needed someone to blame after hearing the rumor that O.M. had raped her at the game. N.S. asserts that "[o]thers at the game had also witnessed O.M. hugging the victim, which contributed to the rumor starting. The victim, who did[ not] want to get her parents involved out of fear of getting in trouble with them, needed someone else to blame,

and, unfortunately, that someone easily became [N.S.]" Brief of Appellant, at 20 (citations to record omitted). N.S. is entitled to no relief.

Our standard of review for a claim that an adjudication of delinquency is against the weight of the evidence is well-established:

> The weight of the evidence is exclusively for the finder of fact[,] who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. An appellate court cannot substitute its judgment for that of the finder of fact. Thus, we may only reverse the lower court's verdict if it is so contrary to the evidence as to shock one's sense of justice.
>
> *Commonwealth v. Small*, [] 741 A.2d 666, 672–73 ([Pa.] 1999) [(citations omitted)]. Moreover, where the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim. *Commonwealth v. Tharp*, 830 A.2d 519, 528 (Pa. 2003) (citations omitted).

*Commonwealth v. Champney*, 832 A.2d 403, 408 (Pa. 2003).

Here, Judge Hackman addressed N.S.'s weight claim as follows:

> The court considered the testimony from the victim, [Officer Daminger], O.M.[,] and [N.S.] himself. After hearing the testimony presented, this court found the victim to be credible and [N.S.] to be [in]credible. The verdict was not based on pure conjecture.
>
> The victim's testimony was consistent. She told O.M. what happened, and he described her as being upset and emotional. Earlier in the night when O.M. had seen [the victim,] she was having fun and she was excited. The victim testified that [N.S.] tried to kiss her and lift up her shirt. This matches the statement made to [Officer Daminger] and O.M.[, which] they both testified to at the hearing. [N.S.] argues that[,] because the victim offered new testimony[,] she is [in]credible. [However, Officer Daminger] asked her open-ended questions, and [the victim] was never

- 14 -

specifically asked if [N.S.] tried to touch her until the day of the hearing. This does not diminish her credibility; it is just an additional detail.

[Moreover, N.S.'s argument] surrounding the rumor about O.M. does not make the victim any less credible. The victim testified that O.M. did not do anything to harm her[,] but that [N.S.] did. The victim did not go back and forth about who harmed her, her testimony was always that [N.S.] was to blame. [N.S.] testified that there were periods of time in which he was alone while he walked behind the bleachers to find other people he knew. The court evaluated and heard the testimony of all the witnesses and concluded that the victim was[,] in fact[,] credible. The court did not abuse its discretion and the guilty verdict was not against the weight of the evidence.

Juvenile Court Opinion, 9/6/23, at 5-6 (unnecessary capitalization omitted).

Upon our review of the record in this matter, we cannot conclude that the juvenile court abused its discretion in concluding that its adjudication of delinquency was not against the weight of the evidence. Accordingly, we affirm.

Dispositional order affirmed.

Judgment Entered.

_____
Benjamin D. Kohler, Esq.
Prothonotary

Date: 5/22/2024

- 15 -