J-S38023-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| IVIN WILLIAM CORNELIOUS | : | |
| | : | |
| Appellant | : | No. 956 EDA 2025 |

Appeal from the Judgment of Sentence Entered August 20, 2024
In the Court of Common Pleas of Chester County Criminal Division at
No(s): CP-15-CR-0001599-2021

BEFORE: McLAUGHLIN, J., KING, J., and BENDER, P.J.E.

MEMORANDUM BY KING, J.:                    **FILED JANUARY 30, 2026**

Appellant, Ivin William Cornelious, appeals from the judgment of sentence entered in the Chester County Court of Common Pleas, following his jury trial convictions for one count each of robbery-fear of bodily injury, robbery of a financial institution, theft by unlawful taking, and three counts of criminal conspiracy.[1]. We affirm and grant counsel's petition to withdraw.

The relevant facts and procedural history of this case are as follows. The Commonwealth charged Appellant and Javone Gordan ("Co-defendant") with the aforementioned offenses in connection with the robbery of the S&T Bank in Kennett Square, Chester County. Appellant and Co-defendant were tried together at a jury trial that commenced on April 9, 2024.

Sharon Kulp testified that on March 5, 2020, she was working as a teller

_____

[1] 18 Pa.C.S.A. §§ 3701(a)(1)(iv), (vi); 3921(a); and 903(a), respectively.

at S&T Bank. Keila Rodriguez Torres was also working as a teller at the bank that day. Shortly after they opened the bank at 8:00 a.m., a black male wearing latex gloves, a mask, sunglasses and a black hoodie entered the bank. The man jumped over the counter and landed behind the counter in Ms. Kulp's area. As he landed, he pushed Ms. Kulp when he attempted to regain his balance. Ms. Kulp asked the man what he was doing and he responded, "It's a robbery, bitch." He told her to open her cash drawer and put all the money in the drawer into his backpack. He then noticed Ms. Rodriguez Torres, who was initially in the back room when the man first entered. The man told Ms. Rodiguez Torres to open her cash drawer and put all the money inside the drawer into his backpack.

The man left the bank, and Ms. Kulp went to lock the front door. She saw the man get into the passenger seat of a black or blue Chrysler, which drove out of the parking lot and turned onto Church Alley. She could not see the man after he entered the vehicle because the vehicle's windows were heavily tinted. The surveillance video from the bank showed a blue Chrysler 300 with tinted windows pulling up to the entrance of the bank immediately preceding the robbery.

Ms. Rodriguez Torres testified that she was in the back room of the bank eating breakfast when the masked man entered the bank. When she heard the commotion, she walked into the hallway. From there, she saw a man taking money from Ms. Kulp's drawer. She felt panicked and scared. When the man saw Ms. Rodriguez Torres, he ordered her to open her drawer and

give him all the money therein. During the encounter, she was scared for her and Ms. Kulp's lives because she thought the man was going to pull out a weapon.

Christine Fox testified that she was the operations supervisor at S&T Bank during this time. She arrived at the bank location after the robbery and conducted an audit of the drawers. The audit revealed that there was $4,938.00 missing from Ms. Kulp's drawer and $5,322.00 missing from Ms. Rodiguez Torres' drawer.

Officer Jonathan Ortiz responded to the scene shortly after the robbery. The teller informed him that the robber fled in a dark blue Chrysler 300. He relayed this information to other officers in the area. Shortly thereafter, a vehicle matching this description was located on Church Alley. Officer Ortiz responded to the location where the vehicle was found. The vehicle was a dark blue Chrysler 300 with a Delaware license plate. The driver and passenger windows of the vehicle had a tint on them. He further noted that the tint appeared to have been hastily applied and was not present on the other windows in the car. While Officer Ortiz was examining the vehicle, Albert McCarthy, who was the former chief of police of the Kennett Township Police Department, came to speak with Officer Ortiz. Mr. McCarthy's property was located further down the street on Church Alley. He reported that the Chrysler 300 had been parked next to his property since February 29, 2020.

Albert McCarthy testified that the back corner of his property is located at the intersection of Juniper Street and Church Alley. This intersection is one

block away from S&T Bank. On February 29, 2020, Mr. McCarthy noticed a Chrysler 300 drive up Church Alley, turn onto Juniper Street and park on Juniper Street, near the corner. The man who drove the Chrysler 300 exited the vehicle and was immediately picked up by an individual driving a Ford, Crown Victoria. The Commonwealth presented footage from the surveillance cameras on the outside of Mr. McCathy's property, which confirmed his testimony.

The Chrysler 300 remained parked on Juniper Street for several days. Early in the morning on March 5, 2020, the day of the robbery, Mr. McCarthy took a photograph of the Chrysler 300 and reported the vehicle to the Kennett Square Police Station. When he returned to his house, he noticed that the Chrysler 300 was gone. He later exited his house to take out the trash and saw the same Chrysler 300 parked on Church Alley with Officer Ortiz standing near it. Mr. McCarthy's surveillance camera footage from the morning of March 5, 2020, showed a Crown Victoria turning onto Juniper Street. A man exited the Crown Victoria and got into the driver's seat of the Chrysler 300. The man reversed the Chrysler 300 onto Church Alley and drove down Church Alley in the direction of S&T Bank.

Detective Christopher Gravina testified that he was the primary investigator in this case. He reviewed the surveillance footage from S&T Bank which showed the Chrysler 300 that was used in the robbery. He noted distinctive features of the vehicle, including hastily applied tint on the front windows of the car and a missing hubcap on the front passenger side wheel.

The vehicle also had a Delaware license plate. Detective Gravina confirmed that these distinctive characteristics were also present in the Chrysler 300 that was found on Church Alley shortly after the robbery. Upon searching the vehicle, officers found a box of latex gloves, similar to the gloves that the robber was seen wearing at S&T Bank. Detective Gravina further confirmed that the license plate number in the photograph that Mr. McCarthy took of the Chrysler 300 that was parked near his house prior to the robbery matched the license plate number of the Chrysler 300 found on Church Alley. As such, Detective Gravina concluded that the Chrysler 300 that was parked near Mr. McCarthy's house was the same vehicle that was used in the robbery and found on Church Alley after the robbery. The registered owner of the Chrysler 300 was Jasmine Britt, who was Appellant's paramour.

Detective Gravina also reviewed Mr. McCarthy's surveillance camera footage, which showed the Crown Victoria picking up and dropping off the man who drove the Chrysler 300 used in the robbery. Detective Gravina noted that the Crown Victoria depicted in these videos had distinctive features, including darkly tinted windows and a large patch of discoloration on the roof in the shape of an eight, from the removal of an old decal. Detective Gravina also reviewed footage from other surveillance cameras in the neighborhood, showing a Crown Victoria with the same distinctive features. From one of these videos, Detective Gravina found the Crown Victoria's license plate number. After sending out a request for information on this vehicle to other law enforcement agencies, Detective Gravina learned that the Crown Victoria

was seen in Hockessin, Delaware on February 27, 2020. Detective Gravina obtained surveillance camera footage from a Shell gas station in Hockessin from this date. The video showed the Crown Victoria, with the same license plate and distinctive features, pulling into the parking lot. The video further showed Appellant exiting the Crown Victoria and entering the Shell gas station. After the robbery, the Crown Victoria was found abandoned in Wilmington, Delaware. The registered owner of the Crown Victoria was Jerome Davis, but the vehicle was regularly used by Jessica McDonald. Ms. McDonald is the mother of Appellant's child.

Joseph Kukosky testified at trial as an expert in DNA analysis. He analyzed DNA swabs that were taken from the Chrysler 300 and the Crown Victoria. Mr. Kukosky testified that Appellant's DNA matched the DNA swabs taken from the steering wheel, door handles, and several items found in the Crown Victoria. Appellant's DNA also matched the DNA swab taken from the steering wheel of the Chrysler 300. Additionally, Co-defendant's DNA matched the DNA found on the steering wheel, gear shift, and door handle of the Crown Victoria.

Detective Keith Cowdright testified as an expert in call detail record analysis and cellular networks. Detective Cowdright testified that he reviewed Appellant and Co-defendant's phone data records. He received much more detailed records from Co-defendant's phone company than Appellant's phone company. On the morning of February 29, 2020, the day that the Chrysler 300 was dropped off near Mr. McCarthy's house, Appellant and Co-defendant's

phones were in the same area in Chester County, where Co-defendant lives. At 11:28 a.m. that day, Co-defendant's phone was near Kennett Square. On the night before the robbery, Co-defendant and Appellant's phones were in the same area in Salem, New Jersey, where Appellant lives. On the morning of the robbery at 6:16 a.m., Co-defendant's phone was again near Salem, New Jersey. Co-defendant's phone then traveled to Kennett Square around the time of the robbery and subsequently traveled to Wilmington, Delaware, where the Crown Victoria was ultimately found abandoned. Appellant's phone records did not show any activity on the morning of the robbery until 9:12 a.m., when Appellant and Co-defendant's phones were in the same area in Wilmington, Delaware.

After the conclusion of the evidence, the jury found Appellant guilty of robbery-fear of bodily injury, robbery of a financial institution, theft by unlawful taking, and three counts of criminal conspiracy. On August 20, 2024, the court sentenced Appellant to an aggregate term of five to ten years' incarceration. On November 13, 2024, Appellant filed a petition pursuant to the Post Conviction Relief Act[2] ("PCRA") seeking to reinstate his right to file a post-sentence motion *nunc pro tunc*. The court granted Appellant's petition and reinstated Appellant's post-sentence rights on November 19, 2024. On December 2, 2024, Appellant filed a post-sentence motion *nunc pro tunc* challenging the weight of the evidence, which the court denied on March 21,

_____

[2] 42 Pa.C.S.A. §§ 9541-9546.

2025. Appellant filed a timely notice of appeal on April 11, 2025. On April 14, 2025, the court ordered Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). On May 30, 2025, counsel for Appellant filed a statement of intent to withdraw pursuant to Pa.R.A.P. 1925(c)(4).

Preliminarily, appellate counsel seeks to withdraw representation pursuant to **Anders v. California**, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967) and **Commonwealth v. Santiago**, 602 Pa. 159, 978 A.2d 349 (2009). **Anders** and **Santiago** require counsel to: (1) petition the Court for leave to withdraw, certifying that after a thorough review of the record, counsel has concluded the issues to be raised are wholly frivolous; (2) file a brief referring to anything in the record that might arguably support the appeal; and (3) furnish a copy of the brief to the appellant and advise him of his right to obtain new counsel or file a *pro se* brief to raise any additional points the appellant deems worthy of review. **See Santiago, supra** at 173-79, 978 A.2d at 358-61. "Substantial compliance with these requirements is sufficient." **Commonwealth v. Reid**, 117 A.3d 777, 781 (Pa.Super. 2015). After establishing that counsel has met the antecedent requirements to withdraw, this Court makes an independent review of the record to confirm that the appeal is wholly frivolous. **Commonwealth v. Palm**, 903 A.2d 1244, 1246 (Pa.Super. 2006). **See also Commonwealth v. Dempster**, 187 A.3d 266 (Pa.Super. 2018) (*en banc*).

In **Santiago, supra** our Supreme Court addressed the briefing

requirements where court-appointed appellate counsel seeks to withdraw representation:

> Neither **Anders** nor **Commonwealth v. McClendon**, [495 Pa. 467, 434 A.2d 1185 (1981)] requires that counsel's brief provide an argument of any sort, let alone the type of argument that counsel develops in a merits brief. To repeat, what the brief must provide under **Anders** are references to anything in the record that might arguably support the appeal.
>
> *      *      *
>
> Under **Anders**, the right to counsel is vindicated by counsel's examination and assessment of the record and counsel's references to anything in the record that arguably supports the appeal.

**Santiago, supra** at 176, 177, 978 A.2d at 359, 360. Thus, the Court held:

> [I]n the **Anders** brief that accompanies court-appointed counsel's petition to withdraw, counsel must: (1) provide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes arguably supports the appeal; (3) set forth counsel's conclusion that the appeal is frivolous; and (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

**Id.** at 178-179, 978 A.2d at 361.

Instantly, appellate counsel has filed an application to withdraw. The application states that counsel has reviewed the record and determined that there are no non-frivolous grounds for an appeal. Counsel subsequently sent a copy of the **Anders** brief to Appellant. Counsel also provided Appellant with a letter explaining Appellant's right to retain new counsel or proceed *pro se* to

raise any additional points Appellant deems worthy of this Court's attention. In the **Anders** brief, counsel summarized the facts and procedural history of Appellant's case. The argument section of the brief cites to portions of the record that might arguably support Appellant's issues on appeal. Counsel also provides the reasons for his conclusion that the appeal is wholly frivolous. Therefore, counsel has substantially complied with the technical requirements of **Anders** and **Santiago**. **See Reid, supra**.

Appellant has not responded to the **Anders** brief *pro se* or with newly retained private counsel. Counsel raises the following issue on Appellant's behalf: "Are there any non-frivolous issues preserved on appeal?" (**Anders** Brief at 4). On appeal, Appellant seeks to challenge the: (i) sufficiency of the evidence; (ii) weight of the evidence; and (iii) improper amendment of the criminal information. Upon reviewing the record, we agree with counsel that Appellant's claims merit no relief.

In reviewing a challenge to the sufficiency of the evidence, our standard of review is as follows:

> As a general matter, our standard of review of sufficiency claims requires that we evaluate the record in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty. Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of

- 10 -

fact can be drawn from the combined circumstances.

The Commonwealth may sustain its burden by means of wholly circumstantial evidence. Accordingly, [t]he fact that the evidence establishing a defendant's participation in a crime is circumstantial does not preclude a conviction where the evidence coupled with the reasonable inferences drawn therefrom overcomes the presumption of innocence. Significantly, we may not substitute our judgment for that of the fact finder; thus, so long as the evidence adduced, accepted in the light most favorable to the Commonwealth, demonstrates the respective elements of a defendant's crimes beyond a reasonable doubt, the appellant's convictions will be upheld.

*Commonwealth v. Sebolka*, 205 A.3d 329, 336-37 (Pa.Super. 2019)

(quoting *Commonwealth v. Franklin*, 69 A.3d 719, 722-23 (Pa.Super.

2013)).

Additionally,

The weight of the evidence is exclusively for the finder of the fact who is free to believe all, part or none of the evidence and to determine the credibility of the witnesses. An appellate court cannot substitute its judgment for that of the finder of fact. Thus, we may only reverse the … verdict if it is so contrary to the evidence as to shock one's sense of justice.

*Commonwealth v. Small*, 559 Pa. 423, [435,] 741 A.2d 666, 672-73 (1999). Moreover, where the trial court has ruled on the weight claim below, an appellant court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim.

*Commonwealth v. Champney*, 574 Pa. 435, 444, 832 A.2d 403, 408

(2003), *cert denied*, 542 U.S. 939, 124 S.Ct. 2906, 159 L.Ed.2d 816 (2004)

(most internal citations omitted).

The Crimes Code defines the offenses of robbery-fear of bodily injury and robbery of a financial institution, in pertinent part, as follows:

**§ 3701. Robbery**

**(a) Offense defined**.—

(1) A person is guilty of robbery if, in the course of committing a theft, he:

\* \* \*

(iv) inflicts bodily injury upon another or threatens another with or intentionally puts him in fear of immediate bodily injury;

\* \* \*

(vi) takes or removes the money of a financial institution without the permission of the financial institution by making a demand of an employee of the financial institution orally or in writing with the intent to deprive the financial institution thereof.

18 Pa.C.S.A. § 3701(a)(1).  "Bodily Injury" means "impairment of physical condition or substantial pain."  18 Pa.C.S.A. § 2301.

The Crimes Code defines theft by unlawful taking as follows:

**§ 3921.  Theft by unlawful taking or disposition**

**(a) Movable property.—**A person is guilty of theft if he unlawfully takes, or exercises unlawful control over, movable property of another with intent to deprive him thereof.

18 Pa.C.S.A. § 3921(a).  "Movable property" is:

Property the location of which can be changed, including things growing on, affixed to, or found in land, and documents although the rights represented thereby have no physical location.

18 Pa.C.S.A. § 3901.

Additionally, the Crimes Code defines the offense of criminal conspiracy as follows:

> **§ 903.  Criminal conspiracy**
>
> **(a) Definition of conspiracy.—**A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:
>
> > (1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or
> >
> > (2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

18 Pa.C.S.A. § 903(a).

"To sustain a conviction for criminal conspiracy, the Commonwealth must establish that the defendant (1) entered into an agreement to commit or aid in an unlawful act with another person or persons, (2) with a shared criminal intent and (3) an overt act was done in furtherance of the conspiracy."

*Commonwealth v. Melvin*, 103 A.3d 1, 42 (Pa.Super. 2014) (citation omitted).

> The essence of a criminal conspiracy is a common understanding, no matter how it came into being, that a particular criminal objective be accomplished.  Therefore, a conviction for conspiracy requires proof of the existence of a shared criminal intent.  An explicit or formal agreement to commit crimes can seldom, if ever, be proved and it need not be, for proof of a criminal partnership is almost

- 13 -

invariably extracted from the circumstances that attend its activities. Thus, a conspiracy may be inferred where it is demonstrated that the relation, conduct, or circumstances of the parties, and the overt acts of the co-conspirators sufficiently prove the formation of a criminal confederation. The conduct of the parties and the circumstances surrounding their conduct may create a web of evidence linking the accused to the alleged conspiracy beyond a reasonable doubt.

*Id.* at 42-43. "Once the trier of fact finds that there was an agreement and the defendant intentionally entered into the agreement, that defendant may be liable for the overt acts committed in furtherance of the conspiracy regardless of which co-conspirator committed the act." ***Commonwealth v. Barnes***, 871 A.2d 812, 820 (Pa.Super. 2005).

Here, the Commonwealth presented significant circumstantial evidence to demonstrate that Appellant and Co-defendant conspired and committed the robbery at S&T Bank. The Commonwealth presented testimony and surveillance footage to show that two men dropped off a Chrysler 300 a few days prior to the robbery, picked it up immediately preceding the robbery, and used it to commit the robbery. Appellant and Co-defendant's phone data records show that Appellant and Co-defendant were in the same area when the Chrysler 300 was dropped off prior to the robbery, on the morning of the robbery, and near the location where the Crown Victoria was found abandoned after the robbery. Additionally, Co-defendant's phone data showed that he was in the area of the bank during the time when the Chrysler 300 was dropped off and when the robbery occurred.

Additionally, Ms. Kulp and Ms. Rodriguez Torres testified that a masked man entered S&T Bank, jumped over the counter, placed them in fear of bodily injury and forced them to give him the contents of their drawers. Ms. Fox testified that the man took $4,938.00 from Ms. Kulp's drawer and $5,322.00 from Ms. Rodriguez Torres' drawer. Ms. Kulp testified that following the robbery, the man ran into the passenger seat of a waiting Chrysler 300 and fled the location. The Commonwealth presented evidence of distinctive features of the vehicles to establish that the Chrysler 300 used in the robbery, and the Crown Victoria used to drop off and pick up the Chrysler 300, were the same vehicles that were linked to Appellant and Co-defendant through surveillance video footage. The Commonwealth further presented evidence to show that Appellant and Co-defendant had access to the Chrysler 300 and the Crown Victoria, and their DNA was present in the vehicles.

Viewing the totality of the evidence in the light most favorable to the Commonwealth as the verdict winner, the evidence was sufficient to sustain Appellant's convictions. *See Sebolka, supra*. Additionally, the jury was free to find the Commonwealth's witnesses credible. On this record, we cannot say that the trial court abused its discretion on ruling on Appellant's weight claim. *See Champney, supra*.

Regarding Appellant's claim that the Commonwealth improperly amended the criminal information, Appellant failed to object to this issue before the trial court. As such, Appellant did not preserve this issue for our

review. *See Commonwealth v. Jackson*, 215 A.3d 972, 977-78 (Pa.Super. 2019) (holding appellant waived challenge to amendment to criminal information where he failed to articulate specific objection at appropriate stage of proceedings before trial court).

Our independent review of the record does not reveal any additional, non-frivolous issues. *See Palm, supra*. Accordingly, we affirm and grant counsel's petition to withdraw.

Judgment of sentence affirmed. Petition to withdraw is granted.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 1/30/2026